MINOT B. RILEY, Individually and as Executor of EDNA M. RILEY, Deceased, Respondent, v HENRY M. WIEMAN et al., Appellants, et al., Defendants.

Third Department, June 2, 1988

APPEARANCES OF COUNSEL

*Levene, Gouldin & Thompson (John Pollock* and *Carlton F. Thompson* of counsel), for Henry M. Wieman and others, appellants.

*Davidson & O'Mara, P. C. (John F. O'Mara* of counsel), for Jack M. Levene and another, appellants.

*Friedlander, Friedlander, Reizes & Joch, P. C. (Alan J. Friedlander* of counsel), for respondent.

### OPINION OF THE COURT

KANE, J. P.

This is an action for medical malpractice.

On June 15, 1981, Edna M. Riley was seen at the medical offices of Nichols, Cooke, Beach and Wieman in the Village of Owego, Tioga County, complaining of rectal bleeding. Defendant Dr. Philip A. Nichols examined Riley and asked her to return three days later to have two additional tests performed, a sigmoidoscopy and a barium enema. She returned on June 18, 1981 and was seen by defendant Dr. Henry M. Wieman, who, after preparation by his assistant, performed the sigmoidoscopy. This test requires the insertion of an

instrument six inches into the patient's rectum to permit visual observation of the inside wall of the rectum. In order to make this observation easier and safer, Wieman introduced air into Riley's rectum with a pump, similar to that used on a blood pressure cuff, to inflate the rectum away from the inserted instrument and thus permit better visibility. Upon the examination of Riley, Wieman observed a small "benign-looking" polyp and thrombosed hemorrhoids. The examination proceeded without incident. Wieman told Riley of the polyp and made arrangements for her to see defendant Dr. Jack M. Levene, a board-certified specialist in radiology, for a barium enema and an "air contrast study".

When Riley arrived at Levene's office, which is in the same building as Wieman's, an X-ray technician prepared her for the "barium enema-air contrast procedure". This procedure involves introducing barium into the patient's large intestine while taking X rays to discover cancers, tumors or other irregularities. After the barium is removed, the doctor inflates the intestine to take more X rays. To keep the barium and air inside the patient, a balloon is placed just inside the patient's rectum, which is inflated with a hand pump to form a seal. During the procedure, the examining doctor is able to see the patient's intestine via a fluoroscope and a television monitor which continuously gives an X-ray picture. Levene, assisted by his technician, performed these procedures on Riley. The first part of the test, inflating the balloon, introducing the barium and taking X rays, apparently went without incident and revealed no problems related to Riley's colon or rectum.

After these first X rays, Riley was required to discharge as much barium as possible, and then return to the examination table for the "postevacuation" X ray and the "air contrast study". The postevacuation X ray was simply a picture of Riley's intestine after she had discharged most of the barium. The air contrast study involved pumping air into her rectum and taking a series of X rays as the air slowly inflated her large intestine. Near the end of the air contrast study, Levene observed that the fluoroscope indicated that the was "air where it shouldn't be", i.e., outside Riley's intestine. He also noticed that barium had leaked from Riley's bowel, which indicated a rupture.

Levene took two of the X rays that had been processed and proceeded directly to Wieman's office where he exhibited to Wieman the X rays depicting the escaped barium and the air outside Riley's bowel. Wieman subsequently asserted that he

saw barium *in* the bowel, but saw none outside Riley's intestine, nor was he told of any by Levene. Wieman also claimed that Levene informed him that air outside the bowel signified a rupture, that it was not serious, the air would "resorb" into the intestine, and that he, Wieman, should prescribe antibiotics and carefully observe Riley. Levene, for his part, claimed that he told Wieman of the tear in the rectum, that there was barium outside the bowel, that the air would probably absorb, but that the mortality rate of patients with a torn bowel was approximately 50%.

Riley arrived at Wieman's office several minutes later and both doctors conferred with her. Collectively, they informed her of the "complication", that she would be given an antibiotic and that she should return the next day for another X ray to see if the air indeed absorbed or to call in the event she developed a fever. The doctors did not discuss hospitalization between themselves or with Riley, although Wieman said he personally considered it, but having no experience with bowel ruptures, he relied on Levene's expertise. After Levene left his office, Wieman prescribed Keflex, an oral antibiotic, and sent Riley home.

That evening, when Riley's husband, plaintiff, returned home after work, he found his wife in bed and in pain. He called his daughter, a nurse, then called Wieman's medical office and spoke to Dr. David E. Kwiatkowski, who told plaintiff to bring his wife to the office. After a brief examination, Kwiatkowski admitted Riley to a hospital, where she came under the care of defendant Dr. John S. Raymond, a surgeon who, on June 18, 1981, performed surgery upon her perforated rectum trying to alleviate her septic condition. However, the infection continued until July 5, 1981, on which date Raymond transferred her to Upstate Medical Center in Syracuse where she came under the care of Dr. David Fromm. Fromm performed an additional operation on July 7, 1981, searching for the precise cause of her infection, which had worsened. Following this surgery, Riley went into septic shock, was placed in the intensive care unit where she began to recover from her infection. Suddenly, however, on July 15, 1981, she died from an arrhythmia of her heart, caused by the "overall septic course that she had gone through". Fromm later stated that the perforation in Riley's rectum following the barium enema was the initial cause of the circumstances leading to her death.

This action is brought by plaintiff, individually and as

executor of his wife's estate, against, among others, Wieman and Levene (hereinafter collectively referred to as defendants), alleging negligence in performing the barium enema, in failing to initially recognize the severity of the torn rectum and in operating to try to repair the perforation. Plaintiff seeks damages for his wife's wrongful death, her pain and suffering and his loss of comfort and companionship.

At the trial of this action, plaintiff called four doctors to testify to defendants' negligence, Fromm, Dr. Michael J. Wasco, Dr. Alexander R. Margulis and Dr. Kenneth K. Meyer, in addition to reading an examination before trial of Levene. Cumulatively, these witnesses testified that Levene negligently performed the barium enema (1) by overinflating the balloon and placing it "too high" in Riley's rectum, (2) by not having an assistant present during the test, and (3) by not advising Wieman to immediately hospitalize Riley after he knew the rectum was perforated. A malpractice panel of doctors who examined defendants' acts concluded that Levene was further negligent in failing to "press the issue with Dr. Wieman to admit the patient to the hospital", but the panel did not find negligence in Levene's performance of the barium enema. The panel did, however, concur with the testimony of expert witnesses who found Wieman negligent in prescribing an oral rather than an intravenous antibiotic and in failing to immediately hospitalize Riley. During the trial, Wieman admitted he was negligent, whereupon plaintiff moved for a directed verdict against Wieman based on this admission, which was denied by Supreme Court. The jury returned a unanimous verdict for plaintiff, finding Wieman 30% responsible and Levene 70% responsible and awarding $202,000 for wrongful death, $225,000 for conscious pain and suffering, and $75,000 to plaintiff, individually on his cause of action. This appeal ensued.

The thrust of defendants'* appeal seeking reversal is directed at the testimony of plaintiff's expert witnesses and particularly at the videotaped testimony of Margulis, a board-certified radiologist and chairman of the department of radiology at the University of California at San Francisco. It was Margulis' opinion that Levene breached the standards of acceptable medical care in the treatment of Riley and that

---

* It is noted that partners in Wieman's medical practice were also named as defendants in the malpractice action. They have joined in Wieman's and Levene's appeal from the verdict.

breach caused her death. Specifically, he opined that it was improper to conduct a barium enema without an assistant, that barium should have been introduced into Riley's intestine before inflating the balloon in order to see the balloon expand on the fluoroscope, and that use of the balloon procedure is very dangerous and should be employed on patients with conditions unlike those demonstrated by Riley. Defendants objected to this testimony on the ground that Margulis was incompetent to express such an opinion since, admittedly, he was unfamiliar with the generally accepted medical practice in the community where this action arose or with the practice in upstate New York as it existed in 1981. The objections were overruled and it is defendants' contention that reversible error is present because of Supreme Court's violation of the long-standing "locality rule" articulated in *Pike v Honsinger* (155 NY 201) providing that, in measuring a doctor's perfor- mance in malpractice cases, the doctor is required to possess "that reasonable degree of learning and skill * * * ordinarily possessed by physicians and surgeons in the locality where he practices" *(supra,* at 209; *see, Toth v Community Hosp.,* 22 NY2d 255, 262; *Gibson v D'Amico,* 97 AD2d 905, 906, *lv denied* 61 NY2d 603; *Twitchell v MacKay,* 78 AD2d 125, 128).

■ We cannot accept defendants' strict application of the "locality rule" in view of leading current authority. Although the rule is still extant, the standards upon which it is based are no longer the same as articulated in *Pike v Honsinger (supra).* In *Toth v Community Hosp. (supra),* the Court of Appeals in discussing the locality rule observed that "conform- [ing] to accepted community standards of practice usually insulates [the doctors] from tort liability" *(supra,* at 262). However, the court then applied the locality rule as a mini- mum standard, inserting the further requirement that doctors use their "best judgment and whatever superior knowledge, skill and intelligence [they have] * * * Thus, a specialist may be held liable where a general practitioner may not" *(supra,* at 262). The resulting two-tiered standard preserves the bene- fits of the locality rule while compelling doctors to use avail- able methods that may exceed local standards *(Prooth v Wallsh,* 105 Misc 2d 653, 655).

Additional evidence of a retreat from strict application of *Pike v Honsinger (supra)* exists in the more broad language used in restating the locality rule. The standard for measuring conduct in malpractice cases is described as whether the doctors possess the knowledge and skill of the "average mem-

ber of their profession" *(Ressis v Mactye,* 108 AD2d 960, 961, *lv dismissed* 67 NY2d 601; *see, Littlejohn v State of New York,* 87 AD2d 951, 952; *Hale v State of New York,* 53 AD2d 1025, *lv denied* 40 NY2d 804; *Gould v New York City Health & Hosps. Corp. [Harlem Hosp.],* 128 Misc 2d 328, 330), or whether the care is "acceptable in the professional community in which [they practice]" *(Schrempf v State of New York,* 66 NY2d 289, 295; *see, Schoch v Dougherty,* 122 AD2d 467, 468, *lv denied* 69 NY2d 605). These restatements of the locality rule accommodate the second tier of the test in *Toth v Community Hosp. (supra)* and impose a higher duty on doctors with knowledge and skill that exceeds local standards. Accordingly, Margulis' testimony was properly admitted into evidence and, although the standards he would impose upon the treatment and care rendered by Levene were rebutted by the testimony of defendants' local radiologist as not representative of the local norms, his testimony described the "superior knowledge, skill and intelligence" that Levene should possess as a board-certified specialist under the rule established in *Toth.* Since these standards are national standards and Levene's practice included the practice of radiology in Georgia, New York City and Rochester, as well as Tioga County, it was for the jury to conclude whether he knew of these standards and should have complied with them.

■ Defendants also contend it was error for Supreme Court to refuse their request to require Dr. Kenneth Meyer of Sayre, Pennsylvania, an expert witness testifying for plaintiff, to produce a copy of a report he had prepared, in the form of a letter to plaintiff's attorney, for use on cross-examination. Meyer did not have a copy of the report with him and plaintiff's counsel had forwarded his only copy to the malpractice panel investigating the matter. Although the report would be admissible to impeach Meyer if it contained prior inconsistent statements *(see, Matter of Hicksville Props. v Board of Assessors,* 116 AD2d 717, 718), we do not view the court's action as erroneous since a copy of the report could have been obtained from Dr. Marc Greenwald, a member of the malpractice panel and a witness who testified for defendants, by request or subpoena. In any event, the court permitted extensive cross-examination of Meyer and its refusal to require production of the report, which obviously was located in Pennsylvania, was not error.

■ We also reject Levene's argument that the denial of plaintiff's motion for a directed verdict against Wieman was

incorrect and prejudicial to Levene. Although Wieman admitted, based upon hindsight, that his less than urgent advice to Riley was a departure from standard medical practice, he persistently maintained at trial that, at the time, he considered his conduct appropriate. Since the jury could have found that his reliance on Levene's expertise was reasonable, we fail to perceive any prejudicial effect on the jury's allocation of responsibility or on the amounts of the verdicts returned, which, under the circumstances, were fair and reasonable *(see, Rush v Sears, Roebuck & Co.,* 92 AD2d 1072; *DeLong v County of Erie,* 89 AD2d 376, 385, *affd* 60 NY2d 296; *Juiditta v Bethlehem Steel Corp.,* 75 AD2d 126, 139).

CASEY, MIKOLL, YESAWICH, JR., and LEVINE, JJ., concur.

Judgment affirmed, with costs.