■ CHARLES KENNY, JR., Respondent, v F. RICHARD LESSER et al., Appellants, et al., Defendant. [722 NYS2d 302] —Carpinello, J. Appeals (1) from a judgment of the Supreme Court (Williams, J.), entered April 3, 2000 in Saratoga County, upon a verdict rendered in favor of plaintiff, and (2) from an order of said court, entered March 2, 2000, which denied the motion of defendants F. Richard Lesser, Mark T. Meddleton and the Equine Clinic at Oakencroft to set aside the verdict.

On October 11, 1993, plaintiff's three-year-old thoroughbred

race horse underwent arthroscopic surgery for removal of a chip fracture in his right front fetlock at defendant Equine Clinic at Oakencroft in Albany County (hereinafter the clinic). The surgery was performed by an out-of-State surgeon, defendant Earl M. Gaughan, who was assisted by defendant F. Richard Lesser, a veterinarian and co-owner of the clinic. Anesthesia was administered and monitored by defendant Mark T. Meddleton, a staff veterinarian at the clinic. During the course of the procedure, the horse was anesthetized with a combination of drugs, the bone chip was successfully removed and the horse was transported to a recovery stall. While in recovery, the horse went into cardiac and respiratory arrest and died.

Claiming that the horse was over anesthetized and improperly monitored during the surgery, plaintiff commenced this veterinary malpractice action against the clinic, Lesser, Meddleton and Gaughan. Following a trial, the jury found that defendants had departed from reasonable standards of veterinary care regarding their treatment of plaintiff's horse, that this departure proximately caused his death and that his fair market value in October 1993 was $100,000. Lesser, Meddleton and the clinic (hereinafter collectively referred to as defendants) appeal from this judgment, as well as from an unsuccessful motion to set aside the verdict.

There was no dispute at trial that plaintiff's horse succumbed to the effects of the anesthesia administered during surgery. The debate was over whether this horse was among the small percentage of equine patients that simply do not survive anesthesia through no fault of the surgeon and/or anesthesiologist, as defendants contended, or whether any act or omission on the part of defendants, particularly Meddleton, caused his death, as plaintiff contended. On this disputed point, plaintiff presented the testimony of one expert, Nicholas Dodman. Defendants claim that the verdict must be reversed and the action dismissed because plaintiff failed to lay a proper foundation to establish that Dodman was familiar with the accepted standards of veterinary care for local veterinary practitioners such as Meddleton and Lesser.

It was established during Dodman's testimony that he is a veterinarian, board certified in veterinary anesthesiology. He is also a professor at Tufts University School of Veterinary Medicine in Boston, Massachusetts. During his career—which spanned nearly 30 years as of the trial in this matter—he lectured all over the country on veterinary anesthesia and anesthetic drugs and authored hundreds of articles on the subject

of veterinary anesthesia. Dodman himself has anesthetized some 2,000 horses undergoing surgery.

Defendants contend that Dodman was unqualified to give an expert opinion on the standard of care because he practiced in a "university" setting, as opposed to this Albany County clinical setting. We disagree. Dodman's testimony, detailing impressive credentials in the very specific area of veterinary anesthesiology, sufficiently established his qualifications as an expert in this case, as well as his familiarity with the standard of care applicable to veterinarians administering anesthesia during surgery. The fact that Dodman did not practice in a clinical setting did not render his testimony inadmissible; rather, it affected the weight of that testimony (*see, Payant v Imobersteg*, 256 AD2d 702, 705; *Hoagland v Kamp*, 155 AD2d 148, 150-151; *Riley v Wieman*, 137 AD2d 309; *see also, Stevens v Bronx Cross County Med. Group*, 256 AD2d 165). To be sure, he was cross-examined on this very point.

We also disagree with defendants' contention that the verdict is against the weight of the evidence, that is, we are unable to conclude that the evidence so preponderated in favor of defendants that the verdict in favor of plaintiff could not have been reached upon any fair interpretation of it (*see, Lolik v Big V Supermarkets*, 86 NY2d 744, 746), particularly after giving due deference to the jury's resolution of credibility issues and conflicting expert evidence (*see, Rivera v Majuk*, 263 AD2d 841; *Fridovich v Meinhardt*, 247 AD2d 791). Dodman testified that the care and treatment rendered by Meddleton and Lesser included departures from accepted standards of veterinary practice which caused the horse's death. Specifically, he opined that the dosage of one particular drug administered to the horse (Rompum) over a short period of time, particularly in conjunction with the administration of a large dosage of another drug (Ketamine) and an inordinately high level of a gaseous volatile anesthetic (Halothane) constituted a departure from accepted standards of veterinary care. These dosages, according to Dodman, caused the horse to become respiratorily and cardiovascularly depressed, a condition which went undetected by Meddleton. When disconnected from pure oxygen after surgery, Dodman's testimony continued, the horse could not sustain himself on room air only.

Dodman also opined that the monitoring procedures employed by Meddleton during surgery—taking a peripheral pulse and making visual observations of the horse—were substandard. According to Dodman, various devices were available to monitor the horse's vital signs during and after surgery, includ-

ing an aneroid gauge to measure blood pressure (blood pressure being the single most important determinate of the depth of anesthesia in a horse), blood gas monitoring equipment and/or an electrocardiogram monitor. He specifically opined that standard practice required that a patient be monitored by these devices when Halothane is being administered. Dodman further noted that no contemporaneous notes were recorded by Meddleton during surgery, which might have enabled him to document the developing trend in the respiratory and cardiac depression that ensued while the horse was under anesthesia. Dodman opined that where, as here, an orthopaedic patient is anesthetized with gaseous Halothane, it is a departure from standard practice not to keep such notes.

In his defense, Meddleton denied over-anesthetizing the horse and further opined that he properly monitored the horse's vital signs during the surgery by making visual and auditory observations and by taking his pulse every five minutes. Of note, plaintiff, who was present in the operating room, contradicted Meddleton on this latter point, testifying that Meddleton sat two feet away from the horse during surgery and never touched him throughout it. The jury also learned through Meddleton's testimony that he considered aborting the surgery because the horse was not properly responding to the anesthesia. It was further established at trial that *after* the horse died, Meddleton created a chart of the entire procedure. This postoperative record attempts to document, in time and dosage, the various drugs administered during surgery, as well as the horse's vital signs at particular time intervals. The jury further learned that, after creating this chart, Meddleton then made additional changes to it. Moreover, while defendants proffered the testimony of four veterinarians who each denied that it was standard practice in local clinical settings to have any monitoring devices present during surgery or to take contemporaneous anesthesia notes, three of these witnesses were Meddleton, Lesser and Gaughan.

As to the jury's discretionary factual finding that the horse's fair market value was $100,000, we find that this figure is fully supported by competent and credible evidence. In addition to his own testimony that the horse showed a tremendous amount of talent, had a "fantastic" disposition with an ability to learn quickly and had made significant racing accomplishments in a relatively short period of time with minimal training, plaintiff also presented evidence that a licensed horse trainer familiar with the horse was ready and willing to purchase him for $75,000 in August 1993 and that this offer remained viable

even after the trainer learned about the subject bone chip. A licensed thoroughbred trainer and horse breeder, who was also very familiar with this specific horse having ridden him on numerous occasions and who had experience buying, selling and evaluating horses, described the horse as "very nice," "very well balanced," "very fast and sound" and healthy. This expert opined that the horse was worth $125,000 in October 1993.

Touting their expert on damages to be the only competent and qualified witness on this issue, defendants urge that the horse's value was considerably less than the $100,000 figure arrived at by the jury, namely, $20,000. The jury heard from this expert and obviously chose to either totally disregard his opinions or simply factor same into its ultimate conclusion on fair market value. This Court finds no reason to interfere with this discretionary, fact-finding function on its part (*see, e.g.*, *Douglass v St. Joseph's Hosp.*, 246 AD2d 695, 697).

Defendants' remaining contentions have been reviewed and rejected as without merit.

Mercure, J. P., Spain, Rose and Lahtinen, JJ., concur. Ordered that the judgment and order are affirmed, with costs.