■ FRANK B. VIALVA, as Administrator of the Estate of MARJORIE VIALVA, Deceased, Respondent, v CITY OF NEW YORK, Defendant, and NEW YORK CITY HEALTH AND HOSPITALS CORP. et al., Appellants.—In a medical malpractice action to recover damages for wrongful death and conscious pain and suffering, the defendants New York City Health and Hospitals Corp., Kings County Hospital, Dr. Gholam Jabbari and Dr. Susan Zilkha appeal from a judgment of the Supreme Court, Kings County (Monteleone, J.), dated April 27, 1984, which is in favor of the plaintiff and against them, upon a jury verdict, in the principal sum of $1,250,000 ($400,000 for conscious pain and suffering and $850,000 for wrongful death).

Judgment modified, on the facts and as an exercise of discretion, by reducing the principal sum awarded to the plaintiff to $850,000 adding thereto a provision severing the plaintiff's cause of action to recover damages for conscious pain and suffering and granting a new trial with respect thereto, unless the plaintiff shall serve and file in the office of the Clerk of the Supreme Court, Kings County, a written stipulation consenting to reduce the verdict with respect to damages for conscious pain and suffering to the principal sum of $100,000 and to the entry of an amended judgment accordingly. As so modified, judgment affirmed, without costs or disbursements. The plaintiff's time to serve and file a stipulation is extended until 20 days after service upon him of a copy of the order to be made hereon, with notice of entry. In the event the plaintiff so stipulates, then the judgment, as so reduced and amended, is affirmed, without costs or disbursements. The findings of fact as to liability are affirmed.

On September 16, 1980, four days before her estimated due date, the decedent in this case, Marjorie Vialva, went to the Kings County Hospital for a routine prenatal checkup. During her examination she complained of decreased fetal movement. Although this is often due to the descent of the fetus in preparation for birth, it sometimes indicates that the fetus is experiencing some difficulty. In order to ascertain the status of the fetus, the decedent underwent a nonstress test, which enabled the doctors to evaluate the fetal heartbeat as it related to the fetus's movements and the mother's contractions. The results of this were "questionably nonreactive", and the decedent was admitted to Kings County Hospital for observation.

At 4:30 P.M., Dr. Gholam Jabbari, the chief resident on duty that evening, examined the decedent and found her to be a candidate for Pitocin, a drug which is utilized to either induce or augment labor. Dr. Jabbari thought that induced labor was necessary because of the questionably nonreactive nonstress test results. He further believed that the use of Pitocin was proper under the circumstances since the decedent was in prodromal labor, experiencing contractions every five or six minutes, and her cervix had already begun to dilate and efface on its own. As was required by hospital regulations, Dr. Jabbari presented his findings to Dr. Susan Zilkha, the attending physician on duty, and obtained her approval for the use of Pitocin.

At approximately 5:00 P.M., the intravenous infusion of Pitocin was commenced. Initially, a dosage of four drops per minute was prescribed, to be increased every ten minutes thereafter by two drops, to six drops, eight drops, and so on, until she achieved an appropriate pattern of labor. Each patient reacts differently to Pitocin, and varying amounts are required to achieve the optimal frequency, strength and duration of contractions. Thus, by gradually increasing the amount of Pitocin administered to a patient, the progress of labor can be carefully monitored.

The administration of Pitocin was continued for 8½ hours. It was discontinued at 1:30 A.M., by Dr. Jabbari when the decedent's contractions had reached the frequency of one per minute. The hospital records fail to indicate how much Pitocin the decedent received, nor do they indicate whether the dosage initially prescribed was modified during the 8½-hour period throughout which it was administered. Precisely how long the intense frequent labor contractions lasted is not ascertainable because the fetal monitor tapes were not available at the trial. All that is indicated in the hospital record is that at 12:30 A.M., the decedent was restless, uncooperative and screaming with contractions.

Approximately 15 minutes after Pitocin was discontinued, the decedent's contractions resumed at an optimal rate of one every two to three minutes. This situation continued until approximately 4:00 A.M., at which time the fetus experienced bradycardia, its heart rate dropping to an unacceptably low level. Dr. Jabbari determined that a delivery by Caesarean section was necessary because the fetus was in distress.

As Mrs. Vialva was being prepared for surgery, she suddenly began to experience convulsions with respiratory arrest.

She began to hemorrhage throughout her body, and then suffered a heart attack. Two hours of resuscitative efforts made by the attending physician and the CPR team proved unsuccessful, and Mrs. Vialva was pronounced dead at 6:00 A.M.

It was subsequently determined that the cause of death was an amniotic fluid embolism, a rare condition which occurs when fluid from the amniotic sac passes through either a rupture, laceration or separation in the mother's uterus, vagina, or cervix, into the mother's bloodstream. The fluid travels through the maternal bloodstream to the lungs, and causes both respiratory arrest and disseminated intravascular coagulation. An amniotic fluid embolism occurs without warning and is, in most instances, fatal.

The plaintiff commenced this lawsuit to recover damages for the decedent's wrongful death and her conscious pain and suffering. At the time of her death, Mrs. Vialva was the mother of three daughters, ages 13, 10 and 5, and she was employed as a file clerk at Kings County Hospital, earning an annual salary of approximately $11,000. The plaintiff herein alleged that the appellants were negligent in their use and administration of Pitocin, and that the appellants failed to adequately monitor the decedent while she was being given this drug. The appellants maintain that the plaintiff failed to establish a causal connection between their malpractice and the decedent's pain, suffering and death. This contention rests largely upon the undisputed fact that an amniotic fluid embolism can occur absent any negligence.

Because causation is always a difficult issue in medicine *(see, Matott v Ward,* 48 NY2d 455, 461-462; *Toth v Community Hosp.,* 22 NY2d 255, 261; *Mertsaris v 73rd Corp.,* 105 AD2d 67, 82),* "it bears emphasizing that to establish a prima facie case a plaintiff need not eliminate entirely all possibility that a defendant's conduct was not a cause. It is enough that he offer sufficient evidence from which reasonable men might conclude that it is more probable than not that the injury was caused by the defendant" *(Mertsaris v 73rd Corp., supra,* at p 83; *see, Schneider v Kings Highway Hosp. Center,* 67 NY2d 743).

Here, the plaintiff has clearly met his burden. Although he was unable to establish with complete certainty that the amniotic fluid embolism did not just happen, he presented testimony from which we can conclude that there is a substantial probability that the appellants' negligent conduct caused Mrs. Vialva's pain and suffering and her death. Specifically, Dr. Jerome Schwartz, the plaintiff's medical expert testified

that the use of Pitocin was contraindicated under the facts at bar because the fetal head was unengaged and still floating in Mrs. Vialva's uterus when the Pitocin was begun. Under these conditions, there is an increased risk that the patient's uterus will rupture. Additionally, Dr. Schwartz stated that Pitocin is a very potent drug and its administration must be very carefully monitored. In fact, the hospital regulations provided that a patient should never be left alone while infusion of Pitocin is running, and New York City Health Code § 41.59 (b) provides that pituitary extracts "shall not be used to induce or activate labor unless the maternity patient is under continuous observation by a physician". Both Dr. Schwartz and the appellants' medical expert, Dr. Maurice Leslie Druzin, acknowledged that an excessive amount of Pitocin would cause contractions of an unsafe frequency and intensity. Such hard, driving labor enhances the likelihood of a rupture in the uterus or a separation of the placenta from the uterus, which in turn, by allowing the amniotic fluid to escape, would permit an amniotic fluid embolism to ensue. Dr. Druzin stated without reservation that amniotic fluid embolisms could be guarded against by the avoidance of measures such as the injudicious administration of stimulating agents that would tend to produce a tumultuous, hard-driving labor.

The record clearly shows that Mrs. Vialva was not adequately monitored and as a result received an excessive dosage of Pitocin. There is no indication of her status between the hours of 12:30 A.M., and 1:30 A.M., the time during which her severe contractions developed. Even when viewing the testimony in the light most favorable to the appellants, they were under a duty to check her progress at least every 15 or 20 minutes. Both Dr. Schwartz and Dr. Druzin concluded that the frequency of the decedent's contractions at 1:30 A.M., demonstrated that she had received an excessive dosage of Pitocin, and both doctors acknowledged that the type of labor which resulted was capable of causing a rupture or laceration which would cause the ensuing amniotic fluid embolism. Causation was thus adequately established.

Contrary to the appellants' assertions, we find that they were afforded a fair trial. The Trial Judge's occasional questioning of witnesses was done in the spirit of the search for truth, and was intended to aid the jury in evaluating the evidence. It was done in an evenhanded, nonprejudicial manner, and did not impart any views of the Trial Judge. The marshaling of the evidence was both fair and accurate, and the missing witness charge was properly given since there was

ample evidence in the record from which the jury could conclude that the three doctors whom the appellants failed to produce at the trial were in possession of both material and relevant evidence which may not have been cumulative.

Regarding the damages award, we find that the award of $400,000 for the decedent's pain and suffering was excessive to the extent indicated. Mangano, J. P., Gibbons, Lawrence and Kunzeman, JJ., concur.