[27 NYS3d 58]

MARIE ABRAMS, Individually and as Administratrix of the Estate of JOHN ABRAMS, Deceased, Appellant-Respondent, v BRAD BUTE, M.D., et al., Defendants, and JESSICA "SMITH" et al., Respondents-Appellants.

Second Department, March 9, 2016

**APPEARANCES OF COUNSEL**

*Anthony T. DiPietro, P.C.*, New York City, for appellant-respondent.

*McAndrew, Conboy & Prisco, LLP*, Melville, and *Locke Lord, LLP* (*Paul E. Dwyer* and *Ethan I. Davis* of counsel), for respondents-appellants.

**OPINION OF THE COURT**

MILLER, J.

This appeal and cross appeal require consideration of the duty owed by a pharmacist in filling a prescription issued by a

physician. In view of our limited precedent on this subject, we take this opportunity to clarify the nature of a pharmacist's duty and the means by which the appropriate standard of care may be established in any particular case. We conclude that when a pharmacist has demonstrated that he or she did not undertake to exercise any independent professional judgment in filling and dispensing prescription medication, a pharmacist cannot be held liable for negligence in the absence of evidence that he or she failed to fill the prescription precisely as directed by the prescribing physician or that the prescription was so clearly contraindicated that ordinary prudence required the pharmacist to take additional measures before dispensing the medication. Applying this standard here, the defendants Jessica "Smith," CVS Pharmacy, and CVS Albany, LLC, are entitled to summary judgment dismissing the complaint insofar as asserted against them.

## I. Factual and Procedural Background

On October 17, 2007, the defendant Dr. Brad Bute performed hemorrhoid surgery on the plaintiff's decedent at North Shore Plainview Hospital. While the decedent was in the hospital, hospital staff administered medications to him, including about six milligrams of hydromorphone, a narcotic drug used to treat pain. After the surgery, Dr. Bute wrote the decedent a prescription for hydromorphone. The decedent was instructed to ingest up to eight milligrams of hydromorphone every three to four hours as needed for pain.

The decedent was driven home from the hospital by the plaintiff, his wife. She then filled the decedent's hydromorphone prescription at a CVS pharmacy located in Hicksville, New York. The plaintiff testified that when she returned home, she gave the decedent a dosage of eight milligrams of hydromorphone. About an hour later, the plaintiff found the decedent "gasping for air." The plaintiff called for an ambulance, but the decedent died shortly before it arrived. An autopsy report prepared at the request of the plaintiff indicated that the decedent died as a result of acute hydromorphone intoxication.

The plaintiff commenced this action to recover damages for, inter alia, personal injuries. The complaint alleged, among other things, that Dr. Bute was negligent in prescribing eight-milligram doses of hydromorphone to the decedent, since an eight-milligram dose of hydromorphone is dangerous for an opioid-naive patient, such as the decedent, who had not previously been exposed to that narcotic. The complaint further al-

leged that Dr. Bute was negligent in allowing the decedent to take an eight-milligram dose of hydromorphone so soon after he had been given a dose of the same drug at the hospital.

The complaint also asserted that the defendants CVS Pharmacy, CVS Albany, LLC, and the individual pharmacist that filled the prescription (hereinafter collectively the CVS defendants) were liable for the decedent's death. In this regard, the complaint alleged that the dosage of hydromorphone prescribed by Dr. Bute was so high that the CVS defendants had a duty to take steps to confirm that the prescription was appropriate for the decedent under the circumstances.

The CVS defendants moved for summary judgment dismissing the complaint insofar as asserted against them, arguing, inter alia, that they did not breach any duty of care owed to the decedent in filling his prescription. The plaintiff opposed the motion and cross-moved for summary judgment on the issue of liability. Both sides submitted expert evidence in support of their respective positions.

The Supreme Court denied both the motion and the cross motion. The court concluded that there were material issues of fact as to whether the CVS defendants breached a duty owed to the decedent. The CVS defendants appealed and the plaintiff cross-appealed from the order.

On appeal, the CVS defendants contend that they had no duty to warn the decedent of the dangers of taking the prescribed dosage of hydromorphone or to otherwise take any steps to ensure that the prescription was appropriate for the decedent under the circumstances. The plaintiff contends that the expert evidence that she submitted in support of her cross motion demonstrated that the CVS defendants departed from the appropriate standard of care and that the CVS defendants failed to rebut her showing.

II. Discussion

"A tort obligation is a duty imposed by law to avoid causing injury to others" (*New York Univ. v Continental Ins. Co.*, 87 NY2d 308, 316 [1995]). "A defendant stands liable in negligence only for breach of a duty of care owed to the plaintiff" (*Sanchez v State of New York*, 99 NY2d 247, 252 [2002]; *see Lauer v City of New York*, 95 NY2d 95, 100 [2000]). "Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party" (*Espinal v Melville Snow*

*Contrs.*, 98 NY2d 136, 138 [2002]; *see Hamilton v Beretta U.S.A. Corp.*, 96 NY2d 222, 232 [2001]).

"The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the court" (*Di Ponzio v Riordan*, 89 NY2d 578, 583 [1997]; *see Waters v New York City Hous. Auth.*, 69 NY2d 225, 229 [1987]). In this sense, the term "duty" is best used to describe "the relation between individuals which imposes upon one a legal obligation for the benefit of the other" (Prosser & Keeton, Torts § 53 at 356 [5th ed 1984]).

In this case, the plaintiff alleged that the CVS defendants filled and dispensed the hydromorphone prescription that had been issued by Dr. Bute. In undertaking to perform these tasks for the benefit of the decedent, the CVS defendants entered into a relationship with him. Given the existence of such a relationship, there is little difficulty in concluding that the CVS defendants owed him a duty of care in filling and dispensing the hydromorphone prescription (*see Willson v Faxon, Williams & Faxon*, 208 NY 108, 114 [1913]; *Allan v State S.S. Co. [Ltd.]*, 132 NY 91, 95 [1892]; *Brumaghim v Eckel*, 94 AD3d 1391, 1392 [2012]).

The CVS defendants nevertheless argue that the scope of this duty, as a matter of law, did not include any obligation to warn the decedent of the dangers of taking the prescribed dosage of hydromorphone or to take any steps to confirm that the prescription was not issued in error. The CVS defendants contend that the prescribing physician is solely responsible for determining whether the prescription is appropriate for any particular patient and that requiring a pharmacist to verify the appropriateness of a prescription would undermine the physician-patient relationship and intrude into the exclusive professional sphere of the treating physician.

"In negligence cases, once a duty is found, the duty, in theory at least, always requires the same [general] standard of conduct, that of a reasonable person under the same or similar circumstances" (Prosser & Keeton, Torts § 37 [4] at 236 [5th ed]; *see generally* 1A NY PJI3d 2:10 at 219 [2015]). Accordingly, in order to determine whether liability exists, "the jury must compare the defendant's conduct to that of a reasonable person under like circumstances" (*Reis v Volvo Cars of N. Am.*, 24 NY3d 35, 42 [2014]). Where the case consists "exclusively of facts whose significance could be well divined by laymen," the jury is "expected to apply their ordinary judgment and practi-

cal experience" in order to determine what a reasonably prudent person would have done under the particular circumstances of the case and whether the defendant deviated from that standard of care (*Havas v Victory Paper Stock Co.*, 49 NY2d 381, 386 [1980]).

However, the Court of Appeals has recognized a "subtle" distinction between this general "reasonable-person standard" and the standard to be applied when a defendant has special training or experience in a trade or profession and is engaged in that capacity (*see Reis v Volvo Cars of N. Am.*, 24 NY3d at 42). As a general matter, one who undertakes to render services in the practice of a profession or trade is "held to the level of skill and care used by others in the community who practice the same profession [or trade]" (*id.*; *see Milau Assoc. v North Ave. Dev. Corp.*, 42 NY2d 482, 486 [1977]; *Landon v Kroll Lab. Specialists, Inc.*, 91 AD3d 79, 83-84 [2011], *affd* 22 NY3d 1 [2013]; *see also* Restatement [Second] of Torts § 299A; 1A NY PJI3d 2:15 at 264). "A claim of professional negligence requires proof that there was a departure from the accepted standards of practice and that the departure was a proximate cause of the injury" (*Georgetti v United Hosp. Med. Ctr.*, 204 AD2d 271, 272 [1994]; *see 43 Park Owners Group, LLC v Commonwealth Land Tit. Ins. Co.*, 121 AD3d 937, 939 [2014]; *Bruno v Trus Joist a Weyerhaeuser Bus.*, 87 AD3d 670, 672 [2011]).

Accordingly, where an individual is alleged to have committed professional negligence, a jury must compare the defendant's conduct to the degree of skill and care used by others in the community who practice in the same field (*see Reis v Volvo Cars of N. Am.*, 24 NY3d at 42; *see also Schrempf v State of New York*, 66 NY2d 289, 295 [1985]; *see generally* 1A NY PJI3d 2:15 at 264). The degree of skill and care that must be exercised in each particular case "may be established through evidence of the general customs and practices of others who are in the same business or trade as that of the alleged tortfeasor" (*Landon v Kroll Lab. Specialists, Inc.*, 91 AD3d at 84; *see Trimarco v Klein*, 56 NY2d 98, 105 [1982]; *Guaman v Industry City Mgt.*, 40 AD3d 698, 699 [2007]; *Cruz v New York City Tr. Auth.*, 136 AD2d 196, 199 [1988]; *see also* Jerome Prince, Richardson on Evidence § 4-603 [Farrell 11th ed 1995]). This may be accomplished by presenting the testimony of an expert who has demonstrated "his or her knowledge of the relevant standards of care" in the trade or profession at issue (*Texter v Middletown Dialysis Ctr., Inc.*, 22 AD3d 831, 831 [2005]; *see Matter of*

*Solano v City of Mount Vernon*, 108 AD3d 676, 677 [2013]; *see generally Dufel v Green*, 84 NY2d 795, 797-798 [1995]). Such expert testimony has "been held to be admissible not only to explain highly technical medical or surgical questions, but has also been found appropriate to clarify a wide range of issues calling for the application of accepted professional standards" (*Selkowitz v County of Nassau*, 45 NY2d 97, 102 [1978] [citation omitted]; *see De Long v County of Erie*, 60 NY2d 296, 307 [1983]; *Landon v Kroll Lab. Specialists, Inc.*, 91 AD3d at 84; *see also* Jerome Prince, Richardson on Evidence § 7-307 [Farrell 11th ed 1995]; Prosser & Keeton, Torts § 28 at 161 [5th ed]).

Here, the CVS defendants are alleged to have been engaged in the practice of pharmacology. The existence of pharmacists as a distinct professional class has been traced back to ancient Egypt and Babylonia, where "a class of preparers of medicines existed separate from those who prescribed and administered drugs" (David B. Brushwood, *The Pharmacist's Duty to Warn: Toward a Knowledge-Based Model of Professional Responsibility*, 40 Drake L Rev 1, 5 n 16 [1991]). However, the specific role played by pharmacists in the distribution of prescription medication has fluctuated in response to changing conditions within the pharmaceutical industry (*see id.* at 16).

For example, "[t]he 'apothecary' of colonial and frontier America usually functioned as both pharmacist and physician" (*id.* at 16 n 70). This role shifted "as medicinal preparations became more complex, and as the expertise to prepare them became more difficult to acquire" (*id.*). In response to this increasing complexity, retail " 'druggists' " emerged, who specialized in compounding prescription drugs and preparing medication for the public's consumption (*id.*). "Following World War II, large pharmaceutical manufacturers assumed the responsibility for formulating and producing drug products; and the emphasis in pharmacy practice switched from compounding, to the dispensing of already compounded products" (*id.* at 16 n 71).

In modern times, the means of distributing prescription medication to the public generally involves three principal actors: the manufacturer, the prescribing physician, and the pharmacist (*see generally McKee v American Home Prods. Corp.*, 113 Wash 2d 701, 708-712, 782 P2d 1045, 1049-1051 [1989]). The interlocking system of liability that has been developed to govern the conduct of these actors reflects the

specialized role that each actor plays in the distribution of prescription medication.

The rules governing the liability of those engaged in the manufacture of prescription drugs are distinguishable from those governing the manufacture of other consumer products (*see Cooley v Carter-Wallace Inc.*, 102 AD2d 642, 644 [1984]). These differences stem from the fact that a prescribed medication "is by its nature an inherently unsafe product" (*Martin v Hacker*, 83 NY2d 1, 8 [1993]; *see Bichler v Willing*, 58 AD2d 331, 334-335 [1977]; *see generally* Restatement [Second] of Torts § 402A, Comment *k*). The manufacture and sale of prescription drugs is nevertheless "fully justified, notwithstanding the unavoidable high degree of risk which they involve," since they may be used to treat medical conditions that pose an even greater danger to the consumer's well-being (Restatement [Second] of Torts § 402A, Comment *k*; *see Wolfgruber v Upjohn Co.*, 72 AD2d 59, 61 [1979], *affd for reasons stated below* 52 NY2d 768 [1980]). Accordingly, "even though its side effects may cause injury, a prescribed drug, accompanied by adequate warnings, is not defective, nor is it unreasonably dangerous" (*Martin v Hacker*, 83 NY2d at 8 [internal quotation marks omitted]; *see Wolfgruber v Upjohn Co.*, 72 AD2d at 61; *see also* Restatement [Second] of Torts § 402A, Comment *k*).

The Court of Appeals has thus recognized that "[a]lthough a prescription drug is by its nature an inherently unsafe product and would in the usual case impute strict liability to its manufacturer, a defense is provided against such liability when the drug is properly prepared, and accompanied by proper directions and warning" (*Martin v Hacker*, 83 NY2d at 8 [internal quotation marks omitted]; *see Spensieri v Lasky*, 94 NY2d 231, 239 [1999]; *Wolfgruber v Upjohn Co.*, 72 AD2d at 61; *Baker v St Agnes Hosp.*, 70 AD2d 400, 405 [1979]; *see also* Restatement [Second] of Torts § 402A, Comment *k*). This defense is "unavailable for products negligently manufactured, negligently distributed or unaccompanied by proper warnings" (*Martin v Hacker*, 83 NY2d at 8; *see Baker v St Agnes Hosp.*, 70 AD2d at 405).

The responsibility of providing information about the potential hazards of a prescription drug "properly falls most heavily on the manufacturer who stands in the best position to recognize and cure defects" (*Baker v St Agnes Hosp.*, 70 AD2d at 405). "The manufacturer's duty is to warn of all potential dangers in its prescription drugs that it knew, or, in the

exercise of reasonable care, should have known to exist" (*Martin v Hacker*, 83 NY2d at 8; *see Glucksman v Halsey Drug Co.*, 160 AD2d 305, 307 [1990]; *Baker v St Agnes Hosp.*, 70 AD2d at 405).

However, under the "learned intermediary doctrine"—first enunciated by the Court of Appeals in *Martin v Hacker* (83 NY2d 1 [1993]), the drug manufacturer's duty to warn "is fulfilled by giving adequate warning through the prescribing physician, not directly to the patient" (*Martin v Hacker*, 83 NY2d at 9; *see Spensieri v Lasky*, 94 NY2d at 239; *Glucksman v Halsey Drug Co.*, 160 AD2d at 307; *Cooley v Carter-Wallace Inc.*, 102 AD2d at 644; *Wolfgruber v Upjohn Co.*, 72 AD2d at 61). This is because "[u]nlike the ordinary consumer shopping in the marketplace, the patient does not freely choose his or her own medication" (*Cooley v Carter-Wallace Inc.*, 102 AD2d at 644). "Since nonmedical consumers are legally precluded from 'self-prescribing' prescription drugs, the physician's function is to evaluate a patient's needs, assess the risks and benefits of available drugs and then prescribe a drug, advising the patient of its risks and possible side effects" (*Wolfgruber v Upjohn Co.*, 72 AD2d at 61; *see Spensieri v Lasky*, 94 NY2d at 239; *Martin v Hacker*, 83 NY2d at 9). Under this paradigm, the physician acts as an " 'informed intermediary' " between manufacturer and patient, and it is the physician who owes a "duty . . . to balance the risks against the benefits of various drugs and treatments and to prescribe them and supervise their effects" (*Martin v Hacker*, 83 NY2d at 9; *see Spensieri v Lasky*, 94 NY2d at 239; *Glucksman v Halsey Drug Co.*, 160 AD2d at 307; *Wolfgruber v Upjohn Co.*, 72 AD2d at 61; *accord* Public Health Law § 2805-d [1]; *Hogan v Schwartz*, 119 AD3d 650, 652 [2014]).

The pharmacist's traditional role in this system of distribution is to accurately fill the prescription in accordance with the instructions provided by the prescribing physician (*see generally* Kimberly A. Burns & Alan R. Spies, *A Pharmacist's Duty to Warn: Promoting the Acceptance of a Consistent Legal and Professional Standard*, 47 Duq L Rev 1, 3 [Winter 2009]; R. Paul Asbury, Comment, *Pharmacist Liability: The Doors of Litigation Are Opening*, 40 Santa Clara L Rev 907, 910 [2000]). This requirement of technical accuracy obligates a pharmacist to ensure that "patients receive the correct drug, in the correct dosage, with the correct directions" (David B. Brushwood, *The Professional Capabilities and Legal Responsibilities of Pharma-*

*cists: Should "Can" Imply "Ought"?*, 44 Drake L Rev 439, 443 [1996]; *cf. McLeod v W.S. Merrell Co., Div. of Richardson-Merrell, Inc.*, 174 So 2d 736, 739 [Fla 1965]).

The need for technical accuracy in filling and dispensing a prescription drug is another product of the inherently dangerous nature of prescription medicine. Indeed, "[p]eople trust not merely their health but their lives to the knowledge, care and prudence of druggists, and in many cases a slight want of care is liable to prove fatal to some one" (*Brown v Marshall*, 47 Mich 576, 583, 11 NW 392, 395 [1882]). "It is therefore proper and reasonable that the care required shall be proportioned to the danger involved" (47 Mich at 538, 11 NW at 395; *see Willson v Faxon, Williams & Faxon*, 208 NY at 114; *Tremblay v Kimball*, 107 Me 53, 57-58, 77 A 405, 408 [1910]). Accordingly, courts in this state have consistently recognized that a pharmacist may be held liable for his or her failure to accurately fill a prescription precisely as directed by the prescribing physician (*see Burton v Sciano*, 110 AD3d 1435, 1436 [2013]; *Brumaghim v Eckel*, 94 AD3d 1391, 1392 [2012]; *Elliott v A.H. Robins Co.*, 262 AD2d 132, 132-133 [1999]).

The view has been expressed that "[a]n unforgiving, 'no mistakes allowed' approach to pharmacy law reflects the technical and nonjudgmental nature of the pharmacist's traditional role and recognizes that an honest error in judgment cannot occur when a pharmacist does not use judgment" (David B. Brushwood, *The Professional Capabilities and Legal Responsibilities of Pharmacists: Should "Can" Imply "Ought"?*, 44 Drake L Rev at 444).

This view reinforces the notion that it is the prescribing physician who is responsible for exercising the professional judgment needed to determine whether a particular course of treatment is appropriate for a given patient. Courts have been reluctant to impose a standard of care on pharmacists that would go beyond the need to accurately fill a prescription and require pharmacists to exercise their own professional judgment in a manner that could conflict with that of the prescribing physician (*see e.g. McKee v American Home Prods. Corp.*, 113 Wash 2d at 711-716, 782 P2d at 1051-1053; *Stebbins v Concord Wrigley Drugs, Inc.*, 164 Mich App 204, 215-218, 416 NW2d 381, 387-388 [1987]; *Eldridge v Eli Lilly & Co.*, 138 Ill App 3d 124, 127, 485 NE2d 551, 552-553 [1985]; *Pysz v Henry's Drug Store*, 457 So 2d 561, 562 [Fla Dist Ct App 1984]; *People's Serv. Drug Stores, Inc. v Somerville*, 161 Md 662, 666, 158 A 12, 13-14 [1932]).

These courts have recognized that the "[p]roper weighing of the risks and benefits of a proposed drug treatment and determining what facts to tell the patient about the drug requires an individualized medical judgment based on knowledge of the patient and his or her medical condition" (*McKee v American Home Prods. Corp.*, 113 Wash 2d at 711-712, 782 P2d at 1051; *see Eldridge v Eli Lilly & Co.*, 138 Ill App 3d at 127, 485 NE2d at 552-553). "This individualized treatment is available in the context of a physician-patient relationship which has the benefits of medical history and extensive medical examinations" (*Ingram v Hook's Drugs, Inc.*, 476 NE2d 881, 886-887 [Ind Ct App 1985]). Accordingly, a rule that requires a pharmacist to independently evaluate the propriety of a physician's prescription would "not only place an undue burden on pharmacists, but would likely create antagonistic relations between pharmacists and physicians and interfere with the patient-physician relationship" (*Brumaghim v Eckel*, 94 AD3d at 1394; *see McKee v American Home Prods. Corp.*, 113 Wash 2d at 709-711, 782 P2d at 1050; *Nichols v Central Mdse., Inc.*, 16 Kan App 2d 65, 67-68, 817 P2d 1131, 1132-1134 [1991]; *Ingram v Hook's Drugs, Inc.*, 476 NE2d at 885-887).

The view that a pharmacist does not exercise any professional judgment has been criticized by courts and commentators alike, who have rejected the contention that "a pharmacy is no more than a warehouse for drugs and that a pharmacist has no more responsibility than a shipping clerk who must dutifully and *unquestioningly* obey the written orders of omniscient physicians" (*Riff v Morgan Pharm.*, 353 Pa Super 21, 28, 508 A2d 1247, 1251 [1986]). It is argued that the failure of courts to recognize the independent professional judgment that is exercised by pharmacists effectively divests them of their professional status and that "[b]y failing to recognize pharmacists as professionals, courts have instead ruled on the applicable standard of care without deferring to industry practice" (Lauren Fleischer, Note, *From Pill-Counting to Patient Care: Pharmacists' Standard of Care in Negligence Law*, 68 Fordham L Rev 165, 172 [Oct. 1999]; *see Horner v Spalitto*, 1 SW3d 519, 522 [Mo Ct App 1999] [stating that to hold "as a matter of law, (that) a pharmacist's duty will never extend beyond accurately filling a prescription . . . would denigrate the expertise which a pharmacist's education provides concerning drugs and their therapeutic use"]).

These authorities show the tension that exists between the professional role of pharmacists within the healthcare system

and judicial reluctance to undermine the physician-patient relationship by altering the traditional decision-making hierarchy. However, these competing concerns are not unique to the pharmacy profession, and a review of other instances where professionals are working under the direction of a physician is instructive.

The Court of Appeals has recognized that "[t]he primary duty of a hospital's nursing staff is to follow the physician's orders, and a hospital is normally protected from tort liability if its staff follows the orders" (*Toth v Community Hosp. at Glen Cove*, 22 NY2d 255, 265 [1968]; *see Warney v Haddad*, 237 AD2d 123, 123 [1997]). This general principle is grounded in policy concerns that hospital staff "may not invade the area of the physician's competence and . . . overrule his orders" (*Toth v Community Hosp. at Glen Cove*, 22 NY2d at 265; *see Somoza v St. Vincent's Hosp. & Med. Ctr. of N.Y.*, 192 AD2d 429, 433 [1993, Kupferman, J., dissenting]), and that there is "every reason" to instead "encourage the hospital staff to carry out diligently the doctor's orders" (*id.* at 265).

However, a nurse or hospital staff member may nevertheless be liable for carrying out a doctor's order "where the hospital staff knows that the doctor's orders are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders" (*Toth v Community Hosp. at Glen Cove*, 22 NY2d at 265 n 3, citing *Fiorentino v Wenger*, 19 NY2d 407, 414-415 [1967]; *see N.X. v Cabrini Med. Ctr.*, 97 NY2d 247, 255 [2002]; *Vaccaro v St. Vincent's Med. Ctr.*, 71 AD3d 1000, 1002 [2010]; *Christopher v St. Vincent's Hosp. & Med. Ctr.*, 121 AD2d 303, 306 [1986]).

This Court has previously, in the context of discussing a package insert in a products liability case, stated that a contraindication is "a circumstance under which the drug must never be given" and that it is "absolute and admits of no exceptions" (*Baker v St. Agnes Hosp.*, 70 AD2d at 402). However, the more general definition of that term is "[a]ny special symptom or circumstance that renders the use of a remedy or the carrying out of a procedure inadvisable, usually because of risk" (Stedman's Medical Dictionary [last updated Nov. 2014], contraindication).

The language used by the Court of Appeals in *Toth v Community Hosp. at Glen Cove* (22 NY2d 255, 265 n 3 [1968])—"so clearly contraindicated"—indicates that there are degrees as to which a procedure or directive may appear to be contraindi-

cated from the perspective of a nurse or hospital employee (*see N.X. v Cabrini Med. Ctr.*, 97 NY2d at 255). Under this formulation, it is not enough to simply show that the physician's directive was actually, in fact, inappropriate for a particular patient, but that circumstances were such that an awareness of the danger may be imputed to the nurse or employee (*see N.X. v Cabrini Med. Ctr.*, 97 NY2d at 255; *Toth v Community Hosp. at Glen Cove*, 22 NY2d at 265 n 3). Accordingly, "observations and information known to or readily perceivable by hospital staff that there is a risk of harm to a patient under the circumstances can be sufficient to trigger the duty to protect" (*N.X. v Cabrini Med. Ctr.*, 97 NY2d at 255). The Court of Appeals has emphasized that "[t]his commonsense approach safeguards patients when there is reason to take action for their protection and does not burden the practice of medicine or intrude upon the traditional relationship between doctors and nurses" (*id.*; *see Toth v Community Hosp. at Glen Cove*, 22 NY2d at 265 n 3).

This general standard articulated in *Toth v Community Hosp. at Glen Cove* (22 NY2d 255 [1968]) has been applied not only to nurses and hospital personnel (*see e.g. Zhuzhingo v Milligan*, 121 AD3d 1103, 1106 [2014]), but also to medical residents and even other doctors who are engaged in assisting a treating physician and who do not themselves exercise any professional judgment with respect to the patient (*see e.g. Soto v Andaz*, 8 AD3d 470, 471 [2004]; *Cook v Reisner*, 295 AD2d 466, 467 [2002]). Accordingly, this Court has stated that "[w]hen supervised medical personnel are not exercising their independent medical judgment, they cannot be held liable for medical malpractice unless the directions from the supervising superior or doctor so greatly deviates from normal medical practice that they should be held liable for failing to intervene" (*Bellafiore v Ricotta*, 83 AD3d 632, 633 [2011]; *see Zhuzhingo v Milligan*, 121 AD3d at 1106; *Soto v Andaz*, 8 AD3d at 471).

The application of this general standard to pharmacists working under the direction of a prescribing physician is consistent with case law from other states. These courts have indicated, using various formulations, that "pharmacists owe their customers a duty beyond accurately [filling] prescriptions [where] the presence of additional factors, such as known contraindications . . . would alert a reasonably prudent pharmacist to a potential problem" (*Morgan v Wal-Mart Stores, Inc.*, 30 SW3d 455, 466 [Tex Ct App 2000]; *see Happel v Wal-Mart*

*Stores, Inc.*, 199 Ill 2d 179, 194, 766 NE2d 1118, 1128 [2002] [standard of care required pharmacy to warn customer where it "was aware not only of (the customer's) drug allergies, but also that (the medication) was contraindicated for persons such as (the customer) with allergies to aspirin"]; *Gassen v East Jefferson Gen. Hosp.*, 628 So 2d 256, 259 [La Ct App 1993] [holding that "a pharmacist has a limited duty to inquire or verify from the prescribing physician clear errors or mistakes in the prescription"]; *McKee v American Home Prods. Corp.*, 113 Wash 2d at 711-716, 782 P2d at 1051-1053 [same]; *Riff v Morgan Pharm.*, 353 Pa Super at 31, 508 A2d at 1252 [pharmacist held jointly liable with prescribing physician for injuries caused by the prescription medication where "the instructions written on the prescription were inadequate"]; *Jones v Walgreen Co.*, 265 Ill App 308, 321 [1932] [stating that "(i)f a prescription is doubtful as to what drug is really intended it is the duty of the pharmacist to be alert to avoid a mistake"]; *People's Serv. Drug Stores, Inc. v Somerville*, 161 Md at 666, 158 A at 14 [rejecting the contention that "pharmacists can safely fill prescriptions calling for doses that are obviously fatal; or that where the doses prescribed appear to be unusual the prescription can be safely filled without inquiry of the physician to make sure there has been no error"]).

The CVS defendants nevertheless contend that New York case law demonstrates that it is the "long-established rule in New York" that a pharmacist, as a matter of law, has no duty to warn a customer or contact the prescribing physician to inquire about the correctness of a prescription. The CVS defendants argue that this rule "bars [the] plaintiff's claim" and entitles them "to judgment as a matter of law."

In this regard, the CVS defendants primarily rely upon language from cases issued by the First, Third, and Fourth Departments (*see Burton v Sciano*, 110 AD3d 1435 [2013]; *Brumaghim v Eckel*, 94 AD3d 1391 [2012]; *Elliott v A.H. Robins Co.*, 262 AD2d 132 [1999]). However, none of those Courts held, as a matter of law, that a pharmacist could never be held liable where he or she accurately filled a physician's prescription (*see Burton v Sciano*, 110 AD3d 1435 [2013]; *Brumaghim v Eckel*, 94 AD3d 1391 [2012]; *Elliott v A.H. Robins Co.*, 262 AD2d 132 [1999]). Rather, in each of those cases it was explicitly noted that the allegations in the complaint failed to adequately allege that the defendant-pharmacy knew or should have known of the danger posed by the prescription (*see Burton v Sciano*,

110 AD3d at 1436 [noting that "(the) plaintiff failed to allege that the dosage fell below or exceeded the medically acceptable range of dosages that should be provided under any circumstance . . . or that (the pharmacy) was aware that the drug was contraindicated for plaintiff" (internal quotation marks omitted)]; *Brumaghim v Eckel*, 94 AD3d at 1393 ["(the) plaintiffs' claim is not that (the pharmacy) filled a prescription that was contraindicated on its face—such as if the dosage of the drug prescribed fell below or exceeded the medically acceptable range of dosages that should be provided under any circumstance"]; *Elliott v A.H. Robins Co.*, 262 AD2d at 132-133 ["(the) plaintiffs do not allege that they had a condition of which the pharmacists were aware, rendering prescription of the drugs at issue contraindicated"]).

Accordingly, these cases are merely instances where the complaint failed to adequately allege that "observations and information known to or readily perceivable" by the pharmacist put him or her on notice of the potential danger such that it "trigger[ed] the duty to protect" (*N.X. v Cabrini Med. Ctr.*, 97 NY2d at 255; *see Burton v Sciano*, 110 AD3d at 1436; *Brumaghim v Eckel*, 94 AD3d at 1393; *Elliott v A.H. Robins Co.*, 262 AD2d at 132-133).

Indeed, earlier cases from two of these same Departments expressly recognized that the scope of a pharmacists' duty may, under certain circumstances, extend beyond merely filling a prescription with technical accuracy (*see Eberle v Hughes*, 77 AD3d 1398, 1399 [2010]; *Hand v Krakowski*, 89 AD2d 650, 650 [1982]). In *Hand v Krakowski* (89 AD2d 650), the patient's "pharmaceutical records identified her as an 'alcoholic' " and yet the defendant-pharmacist issued 728 units of an opiate "contraindicated with the use of alcohol" (*Hand v Krakowski*, 89 AD2d at 651). The Third Department concluded that "[s]uch conduct . . . could be found to constitute a breach of a druggist's duty of ordinary care in that it knowingly ignores the danger and consequences of ingestion by an alcoholic of prescription drugs commonly recognized to be contraindicated" (*id.*).

In *Eberle v Hughes* (77 AD3d 1398, 1399 [2010]), "the patient information sheet included the warning that a person with a history of ulcerative colitis should notify his or her physician or pharmacist before taking the medication, and plaintiff had such a history." The "[p]laintiff testified that [the] defendant pharmacist told her that the warnings on the patient informa-

tion sheet were applicable to extreme cases and that she should not be 'paranoid' and should take the medication" (*id.*). The Fourth Department concluded that "under the circumstances of this case [,] a trier of fact could determine that defendants thereby breached their duty of ordinary care" (*id.*).

As these cases illustrate, there is no merit to the CVS defendants' categorical contention that a pharmacist's duty will never extend beyond accurately filling a prescription (*see id.*; *Hand v Krakowski*, 89 AD2d at 650). Although this may be the extent of a pharmacist's duty in particular cases (*see e.g. Burton v Sciano*, 110 AD3d at 1436; *Brumaghim v Eckel*, 94 AD3d at 1393; *Elliott v A.H. Robins Co.*, 262 AD2d at 132-133), in other cases, "a pharmacist's education and expertise will require that he or she do more to help protect [his or her] patrons from risks which pharmacists can reasonably foresee" (*Horner v Spalitto*, 1 SW3d at 522; *see Eberle v Hughes*, 77 AD3d at 1399; *Hand v Krakowski*, 89 AD2d at 650). Of course, the circumstances of each case will dictate the specific conduct required to satisfy a pharmacist's duty since "the infinite variety of situations which may arise makes it impossible to fix definite rules in advance for all conceivable human conduct" (Prosser & Keeton, Torts § 32 at 173 [5th ed]; *see Levine v City of New York*, 309 NY 88, 92-93 [1955]; *Sadowski v Long Is. R.R. Co.*, 292 NY 448, 455 [1944]; *cf. Lasley v Shrake's Country Club Pharm., Inc.*, 179 Ariz 583, 586-588, 880 P2d 1129, 1132-1134 [1994]; *Dooley v Everett*, 805 SW2d 380, 385-386 [Tenn Ct App 1991]).

■ In sum, we conclude that, when a pharmacist has demonstrated that he or she did not undertake to exercise any independent professional judgment in filling and dispensing prescription medication, that pharmacist cannot be held liable for negligence in the absence of evidence that he or she failed to fill the prescription precisely as directed by the prescribing physician or that the prescription was so clearly contraindicated that ordinary prudence required the pharmacist to take additional measures before dispensing the medication (*see N.X. v Cabrini Med. Ctr.*, 97 NY2d at 255; *Toth v Community Hosp. at Glen Cove*, 22 NY2d at 265 n 3; *Burton v Sciano*, 110 AD3d at 1436; *Brumaghim v Eckel*, 94 AD3d at 1392; *Eberle v Hughes*, 77 AD3d at 1399; *Elliott v A.H. Robins Co.*, 262 AD2d 132 [1999]; *Hand v Krakowski*, 89 AD2d at 651).

■ In this case, the CVS defendants moved for summary judgment dismissing the complaint insofar as asserted against

them. The CVS defendants established their prima facie entitlement to judgment as a matter of law through the submission of expert evidence demonstrating that they did not undertake to render any professional judgment in filling the decedent's prescription, that the prescription was filled precisely as directed by the prescribing physician, and that the prescription was not "so clearly contraindicated" that ordinary prudence required the pharmacist to take additional measures before dispensing the medication (*see generally Doria v Benisch*, 130 AD3d 777, 778 [2015]; *Smolian v Port Auth. of N.Y. & N.J.*, 128 AD3d 796, 801 [2015]; *Montagnino v Inamed Corp.*, 120 AD3d 1317, 1318 [2014]; *Kelley v Kingsbrook Jewish Med. Ctr.*, 100 AD3d 600, 600 [2012]). In this regard, the CVS defendants demonstrated that the dosage that was prescribed was appropriate for the decedent, that the prescription did not exceed that drug manufacturer's maximum recommended dosage, and that, given the information available to the CVS defendants, the generally accepted standards in the community did not require the pharmacist to take any additional measures before filling the prescription (*accord N.X. v Cabrini Med. Ctr.*, 97 NY2d at 255; *Toth v Community Hosp. at Glen Cove*, 22 NY2d at 265 n 3). Furthermore, contrary to the plaintiff's contention, it was entirely appropriate for the CVS defendants to rely upon the expert opinions of individuals who are defendants in the case (*see e.g. Hayden v Gordon*, 91 AD3d 819, 821 [2012]; *Graziano v Cooling*, 79 AD3d 803, 804 [2010]; *Belak-Redl v Bollengier*, 74 AD3d 1110, 1111 [2010]).

In opposition, the plaintiff submitted an affidavit from an expert who stated that an eight-milligram dose of hydromorphone "should only be dispensed to customers who have built up a tolerance to the drug as a result of long-term exposure." The plaintiff's expert stated that the decedent had "never been exposed to opioid medication," and that this information was "reflected in [the CVS defendants'] own records." Accordingly, the plaintiff's expert opined that the dosage was "clearly contraindicated" for the decedent and that "it was a departure from safe and accepted pharmacy practice" for the CVS defendants to fill the prescription without first calling Dr. Bute to question the propriety of the prescription's dosage.

The Court of Appeals has stated that "opinion evidence must be based on facts in the record or personally known to the witness" (*Cassano v Hagstrom*, 5 NY2d 643, 646 [1959]; *see Espinal v Jamaica Hosp. Med. Ctr.*, 71 AD3d 723, 724 [2010]; *see*

*also* Jerome Prince, Richardson on Evidence § 7-308 [Farrell 11th ed]). An expert "cannot reach his [or her] conclusion by assuming material facts not supported by evidence" (*Cassano v Hagstrom*, 5 NY2d at 646; *see Plainview Water Dist. v Exxon Mobil Corp.*, 66 AD3d 754, 755 [2009]; *see also* Jerome Prince, Richardson on Evidence § 7-308 [Farrell 11th ed]). "[A]n expert's affidavit proffered as the sole evidence to defeat summary judgment must contain sufficient allegations to demonstrate that the conclusions it contains are more than mere speculation and would, if offered alone at trial, support a verdict in the proponent's favor" (*Romano v Stanley*, 90 NY2d 444, 451-452 [1997]).

Here, the opinion of the plaintiff's expert—that the CVS defendants deviated from safe and accepted pharmacy practice by failing to contact Dr. Bute before filling the prescription— was based on the premise that the CVS defendants were aware of the particular characteristics of the decedent that rendered the dosage contraindicated for him. In this regard the plaintiff's expert references only the CVS defendants' "records." The plaintiff's expert does not provide any other basis for his conclusion that the CVS defendants knew that the decedent was opioid-naive or otherwise assert that the CVS defendants had a duty to inquire in the absence of any specific knowledge regarding the decedent's prior opiate use.

The record on appeal does not support the factual assumption relied upon by the expert in reaching his professional opinion. Although certain pharmacy records were submitted by the plaintiff in opposition to the motion of the CVS defendants, these records only show prescriptions filled for the decedent at a single pharmacy over a limited period of time. Furthermore, the defendant pharmacist testified at her deposition that she was unable to tell from the records available to her at the time the prescription was filled what prescriptions the decedent had filled at other pharmacies or hospitals. She did not even have access to prescriptions filled for the decedent at other CVS pharmacy locations. Since the expert's opinion was based on facts not supported by the evidence, it was insufficient to raise a triable issue of fact as to whether the prescription was so clearly contraindicated that the applicable standard of care required the CVS defendants to confirm that the prescription was not issued in error (*see Cassano v Hagstrom*, 5 NY2d at 646; *Lagman v Overhead Door Corp.*, 128 AD3d 778, 779 [2015]; *Lopez v Retail Prop. Trust*, 118 AD3d 676, 676 [2014]; *Fenty v Seven Meadows Farms, Inc.*, 108 AD3d 588, 589 [2013]).

Finally, the plaintiff also contends that she raised a triable issue of fact as to whether the CVS defendants filled the prescription precisely as directed by the prescribing physician through the submission of evidence that the maximum dosage was mislabeled. To the extent that the record indicates that the prescription issued by the CVS defendants included instructions that permitted a maximum daily dose of 64 milligrams rather than the maximum daily dose of 32 milligrams called for in Dr. Bute's prescription, this deviation was not a substantial factor in causing the decedent's death since it is undisputed that the decedent died after taking a single eight-milligram dose (*see Alvarado v Miles*, 9 NY3d 902, 903 [2007]).

III. Conclusion

In light of the foregoing, the order is affirmed insofar as appealed from, and reversed insofar as cross-appealed from, on the law, and the motion of the CVS defendants for summary judgment dismissing the complaint insofar as asserted against them is granted.

CHAMBERS, J.P., SGROI and BARROS, JJ., concur.

Ordered that the order is affirmed insofar as appealed from; and it is further,

Ordered that the order is reversed insofar as cross-appealed from, on the law, and the motion of the respondents-appellants for summary judgment dismissing the complaint insofar as asserted against them is granted; and it is further,

Ordered that one bill of costs is awarded to the respondents-appellants.