[991 NYS2d 307]

MAURA CLUNE, Individually and as Administratrix of the Estate of JAMES CAMPBELL, Deceased, Plaintiff, v MICHAEL C. MOORE, M.D., et al., Defendants.

Supreme Court, Erie County, August 1, 2014

**APPEARANCES OF COUNSEL**

*Anspach Law* (*David M. Stillwell* of counsel) for Mercy Hospital of Buffalo and another, defendants.

*Gibson, McAskill & Crosby, LLP* (*Melinda L. Grabowski* of counsel) for Michael C. Moore, M.D., defendant.

*Hogan Willig* (*Patricia S. Walker* of counsel) for plaintiff.

## OPINION OF THE COURT

JOHN M. CURRAN, J.

Defendants Mercy Hospital of Buffalo and Catholic Health System, Inc. (CHS defendants) have moved for summary judgment seeking dismissal of plaintiff's complaint, including all claims and cross claims. Defendant Michael C. Moore, M.D. has cross-moved for an order denying the motion for summary judgment and, if necessary, granting leave to amend his answer to include a cross claim against the CHS defendants.

Plaintiff, the daughter of decedent, James Campbell (decedent), commenced this action against Dr. Moore in 2010. A separate action was commenced against the CHS defendants in 2011. The cases were consolidated into one action pursuant to CPLR 602 (a) in April of 2012. Shortly thereafter, Dr. Moore's counsel served a copy of Dr. Moore's pleadings upon counsel for the CHS defendants.

Dr. Moore first encountered the decedent on September 1, 2009, as a result of Dr. Moore performing a gastroenterology consultation at Mercy Hospital of Buffalo (hospital). The consultation was requested due to a positive fecal occult blood test result. Decedent saw Dr. Moore again on September 15, 2009, at which time Dr. Moore scheduled a colonoscopy.

On October 6, 2009, Dr. Moore performed the colonoscopy at the hospital and there were no apparent complications. At approximately 9:30 a.m., after the colonoscopy was complete, Dr. Moore wrote an order that the decedent should be discharged once the Aldrete criteria had been met. According to the hospital's chart, decedent met the Aldrete criteria at 9:50 a.m. Approximately one hour later, Dr. Moore visited with the decedent in the recovery room. The hospital's chart reflects that the decedent's ride was called at 10:25 a.m.

Dr. Moore testified that he instructed the decedent to stay in the recovery room until he returned as Dr. Moore had to go to another part of the hospital to attend to another patient. Dr. Moore further testified that, at approximately the same time, he

instructed three hospital recovery nurses to keep the decedent in the recovery room until he returned. The hospital's chart contains no such written instructions. The only written physician order with respect to discharge was that the decedent should be discharged once the Aldrete criteria had been met.

One of the nurses identified by Dr. Moore, Carol Lynn Szramkowski, does not recall any such order generally from Dr. Moore or a specific one on the date involving the decedent.[1] Another of the nurses identified by Dr. Moore was not working that day. The record does not contain any testimony from the third nurse.

The nurse manager, Carol Hammond, testified that she never met the decedent although the hospital's chart reflects that Ms. Hammond was in to see the decedent. Ms. Hammond testified that Dr. Moore insists that the hospital follow the discharge instructions for the hospital and meet the Aldrete criteria. She further testified that Dr. Moore "always wants to—you know, he wants to talk to his patients before they're discharged."

Decedent's sister, Carol Blake, was the person who provided the ride from the hospital for decedent. She testified that she was called three times by the hospital to provide a ride: the first to schedule a ride, the second to cancel it and the third to reschedule the ride. Ms. Blake testified that, the second time she was called, the person with whom she spoke indicated "that they were running into a problem or something like that" and that the decedent "wasn't ready yet." The hospital's chart reflects only one call for a ride.

The hospital's chart reflects that decedent was discharged at 12:05 p.m. Dr. Moore had not yet returned to see decedent by then.

Ms. Blake testified that, when she picked up the decedent from the hospital, "he was in a wheelchair, he was pure white and he was struggling to get into the car." Ms. Blake further testified that the decedent indicated to her at the time that he had "terrible pains" in his stomach. The hospital chart reflects that the decedent had abdominal "fullness" but no complaints of pain.

According to the hospital's chart, Ms. Szramkowski was the person overseeing the decedent's discharge from the hospital.

---

1. Ms. Szramkowski's deposition testimony was submitted only in reply by the CHS defendants and only certain pages of the transcript were provided to the court.

She testified that the decedent was discharged from the hospital pursuant to the written physician order and that he was not discharged against medical advice. Nevertheless, the hospital's chart contains a document, apparently signed by the decedent, indicating that he was "leaving the hospital against the advice of the physician or surgeon in charge of my case." Despite a signature line for a "witness," there is no such signature.

Approximately 10 minutes after the decedent was discharged, Dr. Moore returned to the recovery room and inquired as to the whereabouts of the decedent. Dr. Moore conveyed to Ms. Hammond his disappointment that the decedent was not there.

Later on October 6, 2009, Dr. Moore and either a member of the decedent's family and/or the decedent communicated regarding complaints of pain the decedent had in his stomach. There is conflicting testimony about the substance of the telephone conversations Dr. Moore had with the plaintiff and/or the decedent that evening.

Plaintiff found her father dead in his apartment the next day on October 7, 2009. The autopsy report indicates that the decedent's death was caused by "acute peritonitis due to ascending colon perforation due to colonoscopy."

## Discussion

Initially, Dr. Moore's cross motion to amend his answer, if necessary, to reflect that his affirmative defense asserted under article 14 of the CPLR be considered a "cross-claim" against the CHS defendants is granted. There is no surprise to the CHS defendants as the fifth affirmative defense contained in Dr. Moore's answer to the complaint contains reference to article 14. This was served upon counsel for the CHS defendants shortly after consolidation. There also is no prejudice to the CHS defendants as they had sufficient opportunity to conduct discovery on all issues, including the affirmative defense asserted by Dr. Moore, between the time the actions were consolidated in April of 2012 and when the note of issue was filed in August of 2013. Further, it is obvious that there is no surprise to the CHS defendants as their notice of motion indicates they are moving for summary judgment with respect to "all claims and *cross-claims*." For these reasons, the cross motion to amend the answer to include a cross claim in addition to the affirmative defense is in all respects granted.

This motion involves the interplay of responsibilities between a hospital's medical staff and the hospital's duties or lack

thereof to one of its patients.[2] The Court of Appeals has held that hospital staff "may not invade the area of the physician's competence and authority to overrule his orders" and that "[t]he primary duty of a hospital's nursing staff is to follow the physician's orders" (*Toth v Community Hosp. at Glen Cove*, 22 NY2d 255, 265 [1968]).[3] In fact, a hospital is protected from liability where its professional staff follows the orders of private physicians selected by the patient, with the only exception being where the hospital staff knows that the doctor's orders are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders (*Dengler v Posnick*, 83 AD3d 1385, 1387 [4th Dept 2011]).

The purported physician order in question here was Dr. Moore's verbal instruction to the hospital's nursing staff not to discharge the decedent until Dr. Moore saw the decedent again. The Court of Appeals recently held in *Kowalski v St. Francis Hosp. & Health Ctrs.* (21 NY3d 480 [2013]), that a defendant hospital has no right, and therefore no duty, to restrain a patient. Even more recently, the Fourth Department, following *Kowalski*, held that a hospital "did not have a duty to prevent plaintiff from leaving the hospital against medical advice" (*Ingutti v Rochester Gen. Hosp.*, 114 AD3d 1302, 1303 [4th Dept 2014]).

The CHS defendants met their burden on this motion showing entitlement to summary judgment as a matter of law because the hospital chart reflects only Dr. Moore's written order that the patient should be discharged after the Aldrete criteria are met. Because the criteria were met, the hospital was authorized by the written order to discharge the patient. The hospital therefore made a prima facie showing that it complied with its duty under *Toth* and that it had no further duty to restrain the decedent pursuant to *Kowalski* and *Ingutti*.

Dr. Moore's papers have, however, raised numerous questions of fact as to material issues. There is a question of fact regarding whether Dr. Moore gave a verbal order to keep decedent in the recovery room until he returned. Whether such an order

---

**2.** Article 28 of the Public Health Law governs hospitals and section 2801 (10) of that article requires hospitals to have an "organized medical staff and nursing service." The rules and regulations adopted by the Department of Health provide further particulars pertaining to a hospital's medical staff (10 NYCRR 405.4) and nursing services (10 NYCRR 405.5).

**3.** According to 10 NYCRR 405.5 (b) (1) (i), "[n]ursing services personnel shall execute the orders of physicians . . . ."

was given involves conflicting testimony, the credibility of which must be evaluated by a jury.[4] There also is a question of fact regarding whether the decedent was discharged against medical advice. There is a conflict between the testimony of Ms. Szramkowski and the entry in the hospital's chart presenting a question of fact to the extent that the hospital may assert at trial that the discharge was against medical advice rather than pursuant to the physician's written orders.[5] Further, the testimony of Ms. Blake concerning the decedent's condition upon discharge and the rapid decline of decedent's health after discharge raise questions of fact as to the decedent's condition at discharge and whether the hospital staff should not have discharged the decedent pursuant to Dr. Moore's written order (*see e.g. N.X. v Cabrini Med. Ctr.*, 97 NY2d 247, 255 [2002] ["(w)e simply hold that observations and information known to or readily perceivable by hospital staff that there is a risk of harm to a patient under the circumstances can be sufficient to trigger the duty to protect"]).

This case is distinguishable from *Kowalski* because, in that case, the decedent simply got up and left the hospital. Similarly, this case is distinguishable from *Ingutti* because there the record was clear that the patient signed out against medical advice. While there is some hearsay testimony in the record that the decedent insisted upon leaving the hospital, the admissibility and/or the weight of such testimony can be determined only at trial. Further, whether the hospital had a duty not to discharge the decedent will depend on whether a jury believes Dr. Moore issued the verbal order not to do so and whether the jury

---

**4.** 10 NYCRR 405.10 (c) (8) pertains to physician verbal orders indicating that they "shall be used sparingly." The regulation also appears to require that verbal orders be authenticated by the physician "within 48 hours" according to law and hospital "policies and procedures." The hospital has not submitted any such policies and procedures on this motion. The extent to which this regulation may play a role in the court's instructions on the law to the jury must await the evidence at trial.

**5.** 10 NYCRR 405.9 (f) (7) (iii) refers to hospital "[a]dmission/discharge" and provides:

"[i]n the absence of a written order of an attending practitioner discharging a patient, with respect to a patient who insists upon discharging himself from the hospital, the hospital shall obtain, where practicable, a written release from the patient absolving the hospital and the patient's attending practitioner of liability and damages resulting from such discharge."

It is unclear whether the hospital is claiming it discharged the decedent pursuant to the written order, or against medical advice, or both. This too will need to be sorted out by a jury at trial.

concludes the decedent left the hospital against medical advice. These are factual questions the court cannot resolve on this motion.

Lastly, the hospital has raised a causation issue though its expert who has opined that the perforation in decedent's colon occurred after discharge and therefore nothing the hospital did or failed to do caused decedent's injury or death. Dr. Moore has raised triable questions of material fact on this issue as well as by opining that, if the hospital had not discharged the decedent in disregard of his verbal order, appropriate evaluation and treatment of the decedent's perforation would have been performed.

Because plaintiff has incorporated by reference the arguments advanced by Dr. Moore, and because the court must search the record with respect to a motion for summary judgment (CPLR 3212 [b]), the complaint cannot be dismissed. Accordingly, the motion by the CHS defendants is in all respects denied.