Marinelli v Markus-Sullivan (2025 NY Slip Op 51190(U))

[*1]

Marinelli v Markus-Sullivan

2025 NY Slip Op 51190(U)

Decided on July 24, 2025

Supreme Court, Kings County

Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 24, 2025
Supreme Court, Kings County

Lily Marinelli and VITO MARINELLI, as Co-Administrators of the Estate of VALENTINO NICOLA MARINELLI, Deceased, and LILY MARINELLI and VITO MARINELLI, Individually, Plaintiffs,

against
Elizabeth Markus-Sullivan, CNM, JILL-ANN SWENSON, M.D., THE GUIRGUIS OBSTETRICS & GYNECOLOGY GROUP OF BROOKLYN, GUIRGUIS OBSTETRICS & GYNECOLOGY, PLLC and THE NEW YORK METHODIST HOSPITAL, Defendants.

Index No. 22198/2012

Plaintiffs
Brian Thomas McCarthy, Esq. (bmccarthy@abramslaw.com)
Abrams Fensterman, LLP
3 Dakota Drive, Ste 300
New Hyde Park, NY 11042
516-328-2300
Defendants Elizabeth Markus-Sullivan, CNM, Jill-Ann Swenson, M.D., The Guirguis Obstetrics & Gynecology Group of Brooklyn, and Guirguis Obstetrics & Gynecology, PLLC
Amabile & Erman, P.C.
1000 South Avenue
Staten Island, NY
718-370-7030
Defendant The New York Methodist Hospital
Allison Rachel Graffeo, Esq. (allison.graffeo@wilsonelser.com)
Wilson Elser Moskowitz Edelman & Dicker, LLP
150 E. 42nd St.
New York, NY 10017 212-490-3000

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 19-45, 48-63, 64
Defendant NEW YORK PRESBYTERIAN BROOKLYN METHODIST HOSPITAL d/b/a NEW YORK METHODIST HOSPITAL, s/h/a THE NEW YORK METHODIST HOSPITAL ("NYPBMH"), moves for an Order, pursuant to CPLR § 3212, granting summary judgment on behalf of defendant, NYPBMH on the grounds that:
(1) NYPBMH is not vicariously liable for the allegedly negligent care provided by the patient's OB/GYN providers;
(2) NYPBMH did not depart from appropriate standards of care by committing acts of independent negligence in connection with the management of the patient's labor and delivery;
(3) Plaintiffs do not maintain a valid cause of action for lack of informed consent;
(4) Plaintiffs do not maintain a valid cause of action for negligent supervision; and
(5) Plaintiffs do not maintain a valid cause of action for lost services.
Plaintiffs submit opposition to the motion for summary judgment.
Plaintiffs commenced this action on November 16, 2012, asserting claims of medical malpractice against the defendant herein, in connection with treatment and care rendered at NYPBMH. Plaintiffs allege that NYPBMH departed from the appropriate standard of care by committing acts of independent negligence in connection with the patient's labor and delivery. Specifically, Plaintiffs allege that NYPBMH departed from the appropriate standard of care during the patient's labor and delivery via the actions and/or inactions of Nurse Lori Barnwell, ("Nurse Barnwell"), which resulted in the death of the infant.
Prior to the events at issue, the patient's obstetric history included one living child with Down's Syndrome and pre-eclampsia. Between June 24, 2011 and February 14, 2012, the 40-year-old patient received prenatal care from her private OB/GYN providers at the Guirguis Obstetrics & Gynecology Group of Brooklyn, Guirguis Obstetrics & Gynecology, PLLC ("Guirguis OB-GYN"). During this period, she was treated by Jill-Ann Swenson, M.D. ("Dr. Swenson"), nurse midwife Elizabeth Markus-Sullivan, CNM ("CNM Markus-Sullivan"), Dr. Peter Guirguis, and Dr. Fayez Guirguis. Testing throughout this period was unremarkable; the impression was that of normal fetal development, and her estimated date of delivery was between February 22, 2012 and February 24, 2012.
On February 13, 2012, at 8:11 a.m., the mother presented to Labor and Delivery at NYPBMH and reported having contractions since 2:00 a.m. She had a heart rate of 76 bpm, blood pressure of 136/75, and she was 38.3 weeks gestation. The fetal heart rate measured 150 bpm. On examination, the mother was noted to be in "early labor" with mild blood pressure elevation and was advised to ambulate and return to the hospital in a couple of hours. She returned two hours later with complaints of more painful contractions and an examination at 12:31 p.m. showed 3-4 cm dilation.
The mother was admitted to Labor and Delivery, and the maternal and fetal vital signs were then continuously monitored by the electronic fetal heart monitor and by the nursing staff. The patient received an epidural at approximately 1:45 p.m. and began to receive Pitocin at 1 mu/hour at approximately 2:30 p.m. By 7:00 p.m. Pitocin was being administered to the patient at 10 mu/hour. Maternal and fetal vital signs were normal, and dilation was between 5-6 cm.
CNM Markus-Sullivan remained at the patient's bedside from approximately 7:00 p.m. to the end of her labor. Labor and Delivery Nurse Barnwell also came on duty around this time. CNM Markus-Sullivan examined the patient at 9:10 p.m. who was 6-7 cm dilated and 80% effaced, with the fetus at the -2 station. The plan was to continue monitoring the patient and to consider a cesarean section if the patient did not make sufficient progress with labor within the next two hours.
At 11:00 p.m., the patient began to complain of increasingly painful contractions, and an examination showed 7-8 cm dilation, 90% effacement, and -1 fetal station. Fetal heart rate tracings were reassuring, and Dr. Swenson made the decision to let the patient labor. Pitocin was decreased from 10 mu to 6 mu. Defendant contends that at approximately 11:23 p.m., CNM Markus-Sullivan notified Dr. Swenson that the fetal heart rate tracings were significant for variable decelerations with good recovery to baseline. However, Plaintiffs assert that the fetal heart tracings had many concerning signs starting at 11:23 p.m. At deposition, Dr. Swenson noted that the patient's tracings had changed from Category I to Category II around this time, although she stated that she was not concerned because the fetal heart rate remained within normal limits.
The parties submit that fetal tachycardia was recognized on the fetal heart tracing between 11:26 p.m. and 11:27 p.m. and shortly thereafter, the fetal heart tracings reflect that an "alert" was acknowledged. The record indicates that the patient complained of a pain of a 10/10 at about 11:30 p.m. and CNM Markus-Sullivan's examination revealed that the patient was 9 cm dilated. Defendant asserts that CNM Markus-Sullivan texted a photo of the patient's Category II tracing to Dr. Swenson to obtain her opinion.
Defendant asserts that Dr. Swenson was aware of the patient's Category II tracings between 11:40 p.m. and 11:45 p.m. but felt that her status was reassuring as the fetal monitoring strips revealed variability and accelerations with good recovery, and delivery was thought to be imminent. The Pitocin was decreased from 6mu to 3mu. Defendant claims that at 11:52 p.m., the fetal heart monitoring strips reflected a loss of signal for approximately one minute. Defendant argues that again at approximately 11:59 p.m., the fetal heart rate monitor reflected a loss of signal for approximately one minute. In contrast, Plaintiffs argue that the signal was lost at approximately 11:43 p.m., making it a period of approximately 33 minutes without an accurate fetal heart tracing, a fact which Plaintiffs argue Nurse Barnwell had a duty to alert a hospital-attending physician.
Between 11:59 p.m. and 12:09 a.m. the patient's contractions were less frequent although CNM Markus-Sullivan testified that she was not concerned as the Pitocin had been decreased and this was to be expected. Defendant submits that the patient briefly passed out at some point after 12:00 a.m., but Plaintiffs argue that she had been unconscious from 11:50 p.m. to 12:05 a.m. At deposition, CNM Markus-Sullivan stated that at about 12:05 a.m. she became concerned that the monitor had been recording the maternal heart rate as opposed to the fetal heart rate. At 12:12 a.m., the fetal monitoring strip printout indicated "coincidence status on," which indicated that the fetal heart rate was the same or very close to the maternal heart rate.
Plaintiffs claim that a fetal scalp electrode was placed at approximately 12:00 a.m. In contrast, Defendant claims that the fetal scalp electrode was placed at 12:13 a.m. and that at 12:14 a.m., bradycardia of 55 bpm was detected. Both sides agree that this was a Category III tracing and required immediate delivery. CNM Markus-Sullivan testified that it was unclear to her when the fetus first developed bradycardia. The parties submit that at 12:16 a.m., Nurse Barnwell ran into the hallway to alert the attending OB/GYN Dr. Mark DeFazio of the fetal bradycardia and that his assistance was needed for an emergency C-section. Nurse Barnwell testified that she saw no issues with the fetal heart tracing until the last moment.
The parties submit that the infant was delivered via emergency C-section at 12:27 a.m., and the placenta was found to be 100% abrupted from the uterus and a posterior uterine rupture with active bleeding was also noted. An emergency uterine repair was then performed on the patient. The infant was born with Apgar scores of 2/3/3 at one, five, and ten minutes of age. The Apgar score is a method of [*2]assessing a newborn's condition after birth. He was resuscitated, intubated, and transferred to the NICU. The infant's prognosis was poor, and Plaintiffs contend that he was transferred to New York Presbyterian Hospital for possible head cooling. The infant was transferred back to Methodist Hospital for supportive care, and he ultimately passed away on February 22, 2012. Plaintiffs assert that the autopsy confirmed that the infant's cause of death was severe hypoxic ischemic encephalopathy.
In a medical malpractice case when evaluating a summary judgment motion, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure. Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (Rosenzweig v Hadpawat, 229 AD3d 650, 652 [2d Dept 2024] [internal quotation marks and citations omitted]). However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact," (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
Addressing the movant's vicarious liability for the acts and/or omissions of Elizabeth Markus-Sullivan, CNM, Jill-Ann Swenson, M.D., The Guirguis Obstetrics & Gynecology Group of Brooklyn, and Guirguis Obstetrics & Gynecology, PLLC, it is undisputed by Plaintiffs that these defendants were not employees of the hospital but were private providers of the patient's choosing. A hospital will not be held vicariously liable for the actions of a patient's private medical provider, where the patient was admitted by a physician of their choosing and did not come to the emergency room seeking treatment from the hospital (Giambona v. Hines, 104 AD3d 807 [2d Dept 2013]; Dragotta v. Southampton Hosp., 39 AD3d 697 [2d Dept 2007]).
Accordingly, summary judgment is granted to NYPBMH on any claims of vicarious liability for CNM Markus-Sullivan, Dr. Swenson, The Guirguis Obstetrics & Gynecology Group of Brooklyn, and Guirguis Obstetrics & Gynecology, PLLC.
Next, Defendant NYPBMH seeks summary judgment for its vicarious liability for Nurse Barnwell, on the basis that Nurse Barnwell is not liable for any alleged independent acts of negligence.
Generally, "courts have recognized that a nurse who renders treatment can play a significant role in a patient's care and is capable of committing malpractice," but their duty of care is limited (Yakubov v Jamil, 121 AD3d 884, 885 [2d Dept 2014]). It is long established that "[t]he primary duty of a hospital's nursing staff is to follow the physician's orders, and a hospital is normally protected from tort liability if its staff follows the orders" (Toth v Community Hosp. at Glen Cove, 22 NY2d 255, 265 [1968]). However, as the Court of Appeals noted, an exception to this rule exists where the attending physician's acts or omissions "are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders" (i.d. at 265 n 3).
For this exception to apply, "it is not enough to simply show that the physician's directive was actually, in fact, inappropriate for a particular patient, but that circumstances were such that an awareness of the danger may be imputed to the nurse or employee" (Abrams v Bute, 138 AD3d 179, 191 [2d Dept 2016]). "Observations and information known to or readily perceivable by hospital staff that there is a risk of harm to a patient under the circumstances can be sufficient to trigger the duty to protect" (i.d., quoting N.X. v Cabrini Med. Ctr., 97 NY2d 247, 255 [2002]). The applicable standard is that "when supervised medical personnel are not exercising their independent medical judgment, they cannot be held liable for medical malpractice unless the directions from the supervising superior or doctor so greatly deviates from normal medical practice that they should be held liable for failing to intervene" (i.d., quoting Bellafiore v Ricotta, 83 AD3d 632, 633 [2d Dept 2011]; Soto v Andaz, 8 AD3d 470, 471 [2d Dept 2004] [emphasis added]). Thus, a defendant may demonstrate entitlement to summary judgment by demonstrating that the nurse and hospital staff did not exercise independent medical judgment and that [*3]the acts of the supervising physician did not so greatly deviate from normal practice that they should have intervened.
Alternately, clearly a nurse may be liable when, rather than acting in accordance with their supervisor's directives, that nurse "commits an independent act that constitutes a departure from accepted medical practice" (Yakubov v Jamil, 121 AD3d 884, 885 [2d Dept 2014]).
In support of the motion for summary judgment, NYPBMH submits an expert affirmation from Joanne Stone, M.D. ("Dr. Stone"), a licensed physician board certified in obstetrics and gynecology.
Dr. Stone opines that neither Nurse Barnwell, nor any other NYPBMH physician or staff member, departed from the applicable standards of care. Specifically, she opines that it was not a departure from the standard of care by failing to seek the intervention of a hospital-based attending physician prior to the time that the cesarean section was called at approximately 12:16 a.m. Dr. Stone opines that the data on the fetal monitoring strips, when considered in conjunction with the maternal and fetal presentation, and the course of labor as it was occurring, did not raise any obvious cause for concern that would have necessitated Nurse Barnwell to go beyond the directives of the patient's private providers to seek outside intervention and/or immediate cesarean section.
Dr. Stone opines that the role of a labor and delivery nurse during a patient's labor is to work under the supervision of a patient's physicians and/or midwives. The management of a patient's labor and delivery is determined and overseen by that patient's OB/GYN physicians and/or CNMs. When a labor and delivery nurse observes non-reassuring signs during labor, it is the nurse's duty to report such findings to the physicians or CNMs who are overseeing the labor. However, in the event that the managing provider is aware of the signs, the nurse has no further obligation to report to any other provider. When a labor is being managed by a private CNM (who is present), and a private attending (who is not present but in communication with the CNM), a nurse has no further obligation to report to any other attending physician.
Dr. Stone opines that Nurse Barnwell had no obligation to seek intervention from any additional provider because the entirety of the patient's labor and delivery was being overseen by the patient's private providers who were aware of the maternal and fetal conditions as the labor unfolded. Dr. Stone opines that the data reflected on the fetal monitoring strips, when considered in conjunction with the maternal/fetal presentation, and the stage of the patient's labor, was generally reassuring until minutes before CNM Markus-Sullivan called for a C-section. Therefore, Dr. Stone opines that there is no merit to Plaintiffs' claim that Nurse Barnwell negligently failed to override the management of the patient's private providers and failed to summon assistance from a hospital attending physician at an earlier point.
Dr. Stone opines that intermittent periods of fetal tachycardia during labor are generally not concerning unless there is an accompanying loss of fetal heart rate variability and/or a non-reassuring pattern of fetal heart rate decelerations. In the event of prolonged tachycardia and loss of variability or fetal heart rate decelerations, cesarean delivery may be considered. While the fetal heart rate was elevated during the timeframe of 11:26 p.m. and 11:53 p.m., there was good variability, and no fetal heart rate decelerations. The fetal monitoring strips showed the fetal heart rate baseline remained within normal limits until the time that a fetal scalp electrode was placed around 12:13-12:14 a.m. Therefore, Dr. Stone opines that the period of tachycardia in this case did not require Nurse Barnwell to override the management of the patient's private providers and obtain the intervention of a hospital-based physician.
Dr. Stone opines that a normal fetal heart rate baseline is between 110 and 160 bpm and should exhibit moderate variability. Moderate variability is considered reassuring as it is usually indicative of fetal wellbeing. If fetal heart tracing demonstrates minimal or absent variability for a prolonged period, a provider will initiate fetal resuscitative measures in an attempt to increase variability. Dr. Stone opines that Plaintiffs' claim that Nurse Barnwell negligently failed to alert a hospital-based attending because of a lack of fetal heart rate variability during the last 53 minutes of the patient's labor is without merit because the fetal monitoring strips do not exhibit a concerning lack of variability during this time. Dr. Stone included a detailed analysis of the fetal heart rate variability between approximately 11:23 p.m. and [*4]11:27 and concluded that the fetal heart baseline was approximately 170 with moderate variability.
Dr. Stone addresses Plaintiffs' claim that the fetal monitoring strips generated between 11:23 p.m. and 12:16 a.m. demonstrated variable decelerations that became "deeper" and "later," and should have prompted Nurse Barnwell to override the authority of the patient's private providers and to seek help from a hospital-based attending physician. Dr. Stone opines that repetitive and persistent variable decelerations may be non-reassuring and must be closely monitored. However, Dr. Stone opines that the strips generated during the last 53 minutes of the patient's labor do not reflect a pattern of non-reassuring decelerations that should have prompted Nurse Barnwell to seek immediate intervention from a hospital-based attending physician.
Dr. Stone opines that the fetal decelerations during this period consisted of mostly variable decelerations and good return to baseline and an isolated late deceleration, which, when considered in the context of the normal fetal heart rate, good return to fetal baseline, and imminent delivery, was not indicative of fetal distress.
As to Plaintiffs' claim that a "loss of fetal heart monitoring" for 33 minutes should have prompted Nurse Barnwell to seek immediate intervention from a hospital attending, Dr. Stone opines that the fetal monitoring strips do not depict a 33-minute loss of fetal monitoring. Dr. Stone opines that Nurse Barnwell was not negligent in failing to recognize that the fetal heart monitor was erroneously recording the maternal heart rate, as opposed to the fetal heart rate, prior to the time that the fetal monitoring strip indicated "coincidence status on." Dr. Stone opines that this occurrence is not indicative of negligent monitoring or care, but is a risk inherent in the fetal monitoring process. Dr. Stone explains that coincidence can be difficult, if not impossible, to detect as both maternal and fetal heart rates fluctuate during labor. Therefore, it is Dr. Stone's opinion that the fetal monitoring strips generated between 11:23 p.m. and 12:12 a.m., provided no information that would have compelled Nurse Barnwell to suspect that the fetal monitor was picking up the maternal heart rate. He opines that the fetal monitoring strips do not reflect any extended periods of loss of contact during this period and the fetal heart rate was within normal parameters when considered in conjunction with the stage of the patient's labor, and the fetus' imminent delivery.
Dr. Stone explains that between approximately 11:26 p.m. and 11:54 p.m. the fetal heart rate was tachycardic (at or about 160-170), which would not have raised a suspicion that the fetal monitor was picking up the maternal heart rate as the normal maternal heart rate is much lower (between 80-100). The infant's heart rate appeared to return to a normal baseline (between 120 and 130) until the time that a concern for coincidence was detected at or about 12:12 p.m. Given this, Dr. Stone opines that the fetal monitoring strips between 11:43 p.m. and 12:16 a.m. did not require Nurse Barnwell to override the authority of the patient's private providers and to summon an outside attending physician to intervene.
Lastly, the movant anticipates that Plaintiffs will claim that Nurse Barnwell should have sought the intervention of a hospital-based attending due to the concerning nature of the patient's clinical presentation between 11:23 p.m. and 12:13 a.m. Dr. Stone opines that symptoms such as vomiting, briefly "passing out," complaints of pain 10/10, fluctuations in maternal blood pressure, and/or an elevated maternal heart rate are to be expected during the last stage of labor, they are not in and of themselves concerning in the context of imminent delivery. Overall, Dr. Stone opines that the patient's clinical presentation during the last 53 minutes of her labor, when considered alone, and in the greater context of the entirety of the maternal and fetal monitoring, the maternal and fetal presentation, and the stage of labor, did not require Nurse Barnwell to alert another attending to intervene in the management of the patient's private providers.
The movant also submits an expert affirmation from Carol Brekus-Watson, MSN, CNM ("CNM Brekus-Watson"), a certified nurse midwife licensed to practice nurse midwifery in the State of Connecticut.
CNM Brekus-Watson explains that the role of a CNM during labor and delivery includes, but is not limited to, performing vaginal examinations, monitoring maternal and fetal vital signs, interpreting [*5]fetal monitoring strips, and making decisions regarding the augmentation of labor, pain control, and the necessity for cesarean section. A CNM will customarily seek guidance and/or assistance from a collaborating attending physician. CNM Brekus-Watson opines that the role of a labor and delivery nurse consists primarily of monitoring maternal and fetal vital signs, responding to patient's complaints, issuing and executing orders at the direction of the patient's physician(s) and/or CNM(s), reporting pertinent information to the patient's physician(s) and/or CNMs, ensuring patient safety, and documenting pertinent information in the patient's chart. Incomplete charting, as a result of emergent patient care, does not constitute a departure from accepted standards of medical or nursing care.
CNM Brekus-Watson further opines that the labor and delivery nurse does not dictate the management of the patient's labor and delivery, which is overseen by that patient's OB/GYN physician(s) and/or CNMs. It is inappropriate for a labor and delivery nurse to make independent material decisions regarding the management of a patient's labor and delivery such as decisions pertaining to the augmentation of labor, the appropriateness of continuing a trial of labor, and/or the need for immediate cesarean section. In the event that a labor and delivery nurse appreciates non-reassuring symptoms during labor, the nurse has a duty to report such findings to the overseeing physician or CNM. If the managing provider is aware of said symptoms, the labor and delivery nurse has no further obligation to report to any other provider, save for the rare circumstance where it is obvious that the managing provider's directives and/or care significantly deviate from appropriate management.
CNM Brekus-Watson opines that the care that the patient received from Nurse Barnwell was at all times appropriate and within the accepted standard of care. She further opines that Nurse Barnwell properly monitored the patient during the last 53 minutes of labor and that she properly recorded all pertinent information within the patient's chart such as maternal and fetal vital signs, all material exam findings, and all relevant patient complaints throughout the contested period.
CNM Brekus-Watson opines that Nurse Barnwell had no duty to seek the intervention of a hospital-based attending physician between 11:23 p.m. and approximately 12:16 a.m., the time that she alerted Dr. DeFazio to the need for the patient's emergent C-section. Nurse Barnwell had no obligation to seek intervention from any additional provider because the entirety of the patient's labor and delivery was being overseen by the patient's private providers. The patient's private midwife was physically present and actively managing the entirety of the patient's labor between 11:23 p.m. and 12:13 a.m. and the patient's private OB/GYN was in contact with and/or was available to speak with the patient's private midwife physician at all pertinent times. Therefore, CNM Brekus-Watson opines that Nurse Barnwell did not have a duty to obtain additional attending intervention during the period at issue.
As to Plaintiffs' claim that data recorded on the infant's fetal monitoring strips between 11:23 p.m. and 12:13 a.m. should have prompted Nurse Barnwell to override the management of the patient's private providers and alert another attending to the need for immediate intervention, CNM Brekus-Watson opines that it is unreasonable to charge Nurse Barnwell with the duty of substituting her judgment for that of the patient's private providers and that the data reflected on the fetal monitoring strips, when considered in conjunction with the entirety of the medical records and testimony, was generally reassuring until just prior to CNM Markus-Sullivan's call for a cesarean section.
CNM Brekus-Watson opines that intermittent periods of fetal tachycardia during labor are generally not concerning unless there is an accompanying loss of fetal heart rate variability and/or non-reassuring pattern fetal heart rate decelerations. She opines that while the infant's heart rate baseline was elevated for a period of about 20 minutes, the baseline returned to normal after IV fluids were provided. Thereafter, the fetal heart rate baseline remained within normal limits through the time that a fetal scalp electrode was placed, revealing bradycardia, at about 12:13 a.m. Therefore, CNM Brekus-Watson opines that the period of fetal tachycardia did not rise to the level of a non-reassuring finding that should have prompted Nurse Barnwell to obtain an outside attending for immediate intervention.
As to Plaintiffs' claim that Nurse Barnwell negligently failed to alert a hospital-based attending physician of the need to intervene in the patient's labor due to a lack of fetal heart rate variability on the [*6]fetal monitoring strips generated during the last approximate 53 minutes of the patient's labor, CNM Brekus-Watson opines that the fetal monitoring strips during this period do not exhibit a concerning lack of moderate variability.
As to Plaintiffs' claim that the fetal monitoring strips during this period demonstrate variable decelerations that became "deeper" and "later," and recurrent "late decelerations" that should have prompted Nurse Barnwell to seek intervention from an outside attending, CNM Brekus-Watson opines that these decelerations should not have alerted Nurse Barnwell to the need for immediate intervention as this pattern, when delivery is imminent, is common and is not considered non-reassuring. CNM Brekus-Watson included a detailed analysis of the variable decelerations depicted on the fetal monitoring strips between the period of 11:23 p.m. and 12:11 a.m.
CNM Brekus-Watson opines that there is no merit to the claim that the fetal monitoring strips depict a 33-minute loss of fetal monitoring between 11:43 p.m. and 12:16 a.m. Although the monitor ultimately detected a concern that it was picking up the maternal fetal heart rate, CNM Brekus-Watson opines that there was no indication that fetal heart rate was not being properly recorded prior to the time that the patient's providers were alerted to this possibility via an alert on the fetal monitoring strips. She opines that "coincidence" can be difficult, if not impossible, to detect and this occurrence is not indicative of negligent monitoring or care, but a risk of the fetal monitoring process. Therefore, CNM Brekus-Watson opines that Nurse Barnwell did not fail to detect the possibility that the fetal monitor was picking up the maternal heart rate prior to the time of the "coincidence" alert.
CNM Brekus-Watson opines that it was appropriate for Nurse Barnwell to defer to the patient's private providers regarding the significance of the patient's fetal monitoring and the management of her labor, especially given that the alleged negligence involves a claim regarding the failure to interpret/detect extremely subtle indicia of coincidence. She opines that to hold Nurse Barnwell to such a standard is unreasonable given the fact that the patient's private providers were managing the patient's labor throughout this entire time.
Defendant anticipates that Plaintiffs will claim that Nurse Barnwell should have sought the intervention of a hospital-based attending due to the patient's concerning signs/symptoms during the last 53 minutes of the patient's labor. CNM Brekus-Watson opines that these signs/symptoms are to be expected and/or are not in and of themselves concerning in the context of an imminent delivery and therefore did not require Nurse Barnwell to alert another attending to intervene in the management of the patient's private providers.
NYPBMH has established prima facie entitlement to summary judgment, based on the expert submissions setting forth that Nurse Barnwell's role was limited to assisting and working under the supervision of CNM Markus-Sullivan, who was present at all times, and the OB/GYN Dr. Swenson, who was consulting CNM Markus-Sullivan by text and phone. The movant establishes that Nurse Barnwell did not exercise independent medical judgment, but instead followed their directives in managing the patient's labor and delivery.
Further, the experts establish prima facie that, based on the monitoring of the fetal heart tracings, maternal and fetal vital signs, and the patient's presentation, the progression of the labor was "generally reassuring" and not "so patently abnormal that it should have alerted Nurse Barnwell to an immediate concern for both maternal and fetal well-being." Thus, the experts establish that the private midwife and OB/GYN's orders and their alleged delay in calling for a C-section did not "significantly deviate" from normal practice, and Nurse Barnwell is not liable for a failure to intervene. The burden therefore shifts to Plaintiffs to raise an issue of fact.
In opposition to the motion, Plaintiffs submit an expert affirmation from Douglas Phillips, M.D. ("Dr. Phillips"), a licensed physician board certified in obstetrics and gynecology.
Dr. Phillips opines that Nurse Barnwell independently failed to recognize the signs of fetal distress from the fetal heart rate tracings, failed to monitor the vital signs of the patient and her infant, and failed to override the decisions of CNM Markus-Sullivan and notify an attending physician who was on [*7]site. Dr. Phillips opines that Nurse Barnwell's failure to inform an attending physician of the concerning signs proximately caused the patient to suffer a placental abruption and uterine rupture, leading to extreme fetal distress and death of the infant.
Dr. Phillips opines that there were multiple concerning indications on the fetal heart tracings that Nurse Barnwell should have reported to a hospital-attending physician. Specifically, he opines that there were "clear signs" and "unmistakable evidence" of fetal distress towards the end of the patient's labor. Dr. Phillips explains that a review of the records from 11:23 p.m. to 12:16 a.m. shows a consistent fetal heart rate of over 160 bpm, which is indicative of fetal tachycardia and fetal distress. Dr. Phillips opines that the recurrent decelerations that occurred between 11:36 p.m. and 11:43 p.m. indicated potential uteroplacental insufficiency, which combined with the patient's age, would suggest the need for a cesarean section.
Dr. Phillips counters the opinion of the movant's experts that the fetal monitoring data was generally reassuring until the time CNM Markus-Sullivan called for a C-section at 12:16 a.m. Plaintiffs' expert opines that the vital signs were indicative of a Category III tracing. He opines that the patient's failure to adequately progress in her labor and delivery from 9:10 p.m. to approximately 11:00 p.m., increasingly painful contractions, decrease of Pitocin due to tachysystole, two epidurals which provided minimal relief, the recurrent decelerations, and the loss of fetal heart tracing signal around 11:43 p.m. all should have indicated the need for a cesarean section.
Dr. Phillips opines that in addition to the concerning indications on the fetal heart tracings, there is an issue of whether the patient was properly informed about the dangers of Pitocin and the failure to timely discontinue its use. Dr. Phillips opines that the patient would not appear to have been an ideal candidate for Pitocin due to her advanced maternal age, and the failure to adequately progress in her labor should have precipitated the consideration of a cesarean section sooner.
Dr. Phillips opines that the complications that arose during the patient's labor and delivery were the result of the failure of Nurse Barnwell to immediately notify the triage attending of obvious signs of fetal distress and the need for immediate delivery via cesarean section.
Plaintiffs also submit an expert affirmation from Marcus Hermansen, M.D., ("Dr. Hermansen"), a board-certified Pediatrician and Neonatologist licensed to practice in the states of New Hampshire and Arizona.
Dr. Hermansen opines that from 11:23 p.m. to 12:16 a.m. there were signs of fetal tachycardia and late decelerations that would classify the patient as a non-reassuring Category II tracing or even a Category III tracing. At the very least, Dr. Hermansen opines that the fetal heart tracings indicated Category II tracings that did not improve over the period of more than 40 minutes. He opines that when Category II tracings do not improve or deteriorate to Category III, an immediate cesarean section is required. Despite this lack of improvement, he opines that Nurse Barnwell negligently failed to notify the hospital attending physician.
Dr. Hermansen opines that had the infant been delivered even minutes earlier, he would have survived without brain injury, and the failure of Nurse Barnwell to call for help earlier directly led to extended fetal distress, resulting in the infant's ultimate death. Dr. Hermansen opines that but for the inaction of Nurse Barnwell, the infant would still be alive today and would be a healthy male child with no disabilities. He opines that due to a failure to notify a physician to deliver the infant once it became apparent that he was in distress, the infant suffered a period of deprivation of oxygen that fatally injured him.
He opines that the infant died because of the patient's uterine rupture with placental abruption, which caused the infant to be born with acute and severe birth asphyxia and hypoxic-ischemic encephalopathy. Therefore, Dr. Hermansen opines that had Nurse Barnwell recognized the concerning signs and informed a hospital-attending physician earlier causing the infant to be delivered prior to experiencing a protracted period of fetal bradycardia, he would have been delivered as a healthy baby boy.
Based on the submissions, Plaintiffs have raised issues of fact sufficient to defeat the motion for summary judgment with respect to NYPBMH. The experts set forth conflicting opinions on whether Nurse Barnwell had a duty to override the authority of the patient's private providers and seek outside intervention for an emergency C-section, in light of the fetal monitoring data and clinical presentation, which Plaintiffs characterize as highly concerning and abnormal. It is well established that "a hospital can be held concurrently liable with a private attending physician if its employees commit independent acts of negligence or the attending physician's orders are contraindicated by normal practice" (Zhuzingo v. Milligan, 121 AD3d 1103, 1106 [2d Dept 2014]).
In a case very similar to the facts herein, the Second Department held that there were issues of fact as to whether the hospital's nursing staff, despite being under the supervision of a private midwife, "departed from good and acceptable medical practice by failing to summon an obstetrician when the infant plaintiff's fetal heart rate dropped below normal" (i.d. at 1106-1107). Here, there is a question of fact presented by the parties' experts as to whether Nurse Barnwell failed to take adequate measures to notify the hospital's attending physician when the fetal heart tracings showed signs of fetal distress and the need for an emergent C-section. The expert submissions raise triable issues of fact as to whether these circumstances presented "an awareness of the danger [which] may be imputed to the nurse or employee," such that she had a "duty to protect" the mother and infant and intervene, rather than wait for CNM Markus-Sullivan's order to alert a physician and call for a C-section (Abrams at 191).
In their reply, the movant attempts to distinguish this case from Zhuzhingo solely by arguing that there is insufficient information on the specifics of that case, and here (according to NYPBMH's experts) the overall presentation, stage of labor, and fetal heart tracings were not indicative of fetal distress to a degree that should have alerted Nurse Barnwell to intervene. However, this is the very issue of fact raised by Plaintiffs' experts, who offer a counter-opinion that the Category III or non-improving Category II tracings required Nurse Barnwell to override the directives of the CNM and notify a hospital physician, because the delay in doing so greatly deviated from normal practice.
There is also a conflict between the experts on the standard of care for monitoring fetal heart tracings. Defendant's experts contend that Nurse Barnwell did not deviate from the standard of care, as the signs of fetal distress were subtle and had been reported to the patient's private providers. In contrast, Plaintiffs' experts assert that there were many concerning signs of maternal and fetal distress for a period of 53 minutes, which Nurse Barnwell negligently ignored (see Abrams at 191 ["observations and information known to or readily perceivable by hospital staff that there is a risk of harm to a patient under the circumstances can be sufficient to trigger the duty to protect"]). Plaintiffs' experts opine that one of Nurse Barnwell's duties was to monitor the fetal heart tracings and inform a physician "of any concerning signs that suggested the necessity of a Cesarean section or emergency care." In light of the risk of harm to the patient, Plaintiffs contend that the acts and omissions of the midwife and (off-site) attending physician managing the patient's labor and delivery so greatly deviated from the standard of care that Nurse Barnwell had a duty to intervene and alert the on-site physician to perform a C-section prior to 12:16 a.m.
There are issues of fact and credibility between the parties' experts as to whether the delay in alerting a physician and ordering a C-section, in light of the signs of fetal distress, so greatly deviated from normal practice as to constitute malpractice on the part of Nurse Barnwell. As those issues must be resolved by a jury, the part of the motion seeking summary judgment in favor of NYPBMH, as to their vicarious liability for Nurse Barnwell's alleged failure to timely notify a physician to perform a C-section, is denied.
Notwithstanding the above, the opinions of Plaintiffs' expert Dr. Phillips are insufficient to raise an issue of fact as to any independent negligence or breach of duty from NYPBMH staff regarding the administration of Pitocin. Dr. Phillips opines that the mother "would not appear to be an ideal candidate for Pitocin" based on her age and risk factors, and he further opines that the "failure to timely discontinue Pitocin" was a proximate cause of her uterine rupture and the infant's death.
As discussed, "when supervised medical personnel are not exercising their independent medical [*8]judgment, they cannot be held liable for medical malpractice unless the directions from the supervising superior or doctor so greatly deviates from normal medical practice that they should be held liable for failing to intervene" (Zhuzhingo at 591-592, quoting Bellafiore at 633). Hospital staff acting under the supervision of physicians are only liable for malpractice when "the doctor's orders are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders" or when "the hospital's employees have committed independent acts of negligence" (Cynamon v Mount Sinai Hosp., 163 AD3d 923, 924-925 [2d Dept 2018]). The decision to administer or discontinue Pitocin does not constitute an act or omission that so greatly deviated from normal practice requiring Nurse Barnwell to have questioned the directives of the supervising physician or midwife. The opinion of Plaintiffs' expert that the patient was not an "ideal candidate" does not support a finding that Nurse Barnwell or any other member of the NYPBMH staff should have exercised independent medical judgment in initiating, tapering, or discontinuing Pitocin because the doctor's orders were so clearly contraindicated by normal practice. As NYPBMH are not liable for any acts of independent negligence or failure to intervene with respect to the administration of Pitocin, those claims must be dismissed as a matter of law.
Although the movant addresses the issue of informed consent, Plaintiffs did not assert a cause of action for lack of informed consent against NYPBMH in the Complaint or Bill of Particulars, and it is not part of the Court's consideration herein.
The parties also address claims of spoliation and loss of sepulcher in the opposition and reply, but no relief on these issues was sought by any motion or cross motion before this Court.
Plaintiffs do not oppose the part of Defendant's motion seeking dismissal of any claims of negligent supervision asserted in the Complaint. Accordingly, summary judgment is granted to the movant on those claims.
Finally, with respect to co-plaintiff Vito Marinelli's claims for loss of services, Defendant argues that these derivative claims cannot be maintained if there is no underlying medical malpractice (see Klein v Metropolitan Child Services, Inc., 100 AD3d 708, 711 [2d Dept 2012]). However, because issues of fact remain as to the underlying malpractice claims, the part of the motion seeking summary judgment on the loss of services claim is denied.
Accordingly, it is hereby:
ORDERED that Defendant NYPBMH's motion for summary judgment (Seq. No. 7) is GRANTED TO THE EXTENT of dismissing any vicarious liability claims against NYPBMH for the acts of the patient's private OB/GYN providers, dismissing Plaintiffs' claims against NYPBMH regarding the administration or discontinuance of Pitocin, and dismissing Plaintiffs' claims of negligent supervision, and the motion is DENIED with respect to NYPBMH's vicarious liability for the nurse's alleged failure to intervene and notify a hospital physician.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.